# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Adoption of K.B.D.*, 2012 IL App (1st) 121558

---

| | |
|---|---|
| Appellate Court Caption | *In re* ADOPTION OF K.B.D., a Minor (Aaron B.D. and Jennifer D., Petitioners-Appellees, v. Vicki S., n/k/a Vicki F., Respondent-Appellant). |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-1558 |
| Filed | December 14, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The natural father of a nine-year-old child and the father's former wife were properly allowed to adopt the child following the entry of a finding that the child's mother was unfit based on depravity, since the finding of depravity was not against the manifest weight of the evidence and petitioners had standing to petition for the adoption of the child, despite the fact that they were no longer married. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-COAD-04; the Hon. Susan Fox Gillis, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Douglas W. Graham, of Chicago, for appellant. |
| | |
| | Kathleen Hogan Morrison, of Kathleen Hogan Morrison, P.C., of Chicago, for appellees. |
| | |
| Panel | JUSTICE R. GORDON delivered the judgment of the court, with opinion. |
| | Presiding Justice Lampkin and Justice Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1     The instant case arises from respondent Vicki F.'s appeal of the trial court's order terminating her parental rights during a contested adoption proceeding, thereby permitting the adoption of nine-year-old K.B.D. (the child) by petitioners Aaron B.D. and Jennifer D. Vicki claims that the trial court's finding that she was unfit was against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 2                                         BACKGROUND
¶ 3                              I. Pretrial Procedural History
¶ 4     On January 5, 2010, Aaron and Jennifer filed a petition to adopt the child, who was born on April 20, 2003, to Aaron and Vicki. They stated that they were married and that Aaron and Vicki were never married. They further stated that the child was in the custody of and resided with Aaron and Jennifer. They stated that Aaron had sole custody of the child and consented to his adoption of the child.

¶ 5     They claimed that Vicki demonstrated evidence of her intent to forego her parental rights by failing for a period of more than 12 months to maintain contact with or plan for the future of the child even though she was physically able to do so and further claimed that Vicki failed for a period of more than 12 months to make a good-faith effort to provide a reasonable amount of financial support for the child. They claimed that Vicki had failed to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the child and was therefore an unfit person, making her consent to the adoption unnecessary. The petition accordingly requested that Vicki's parental rights be terminated and sought leave to adopt the child.

¶ 6     On January 7, 2010, a guardian *ad litem* (GAL) was appointed to represent the interests of the child.

¶ 7     On February 16, 2010, Vicki filed a *pro se* answer and an objection to the petition for

adoption,[1] requesting an order denying the petition for adoption and an award of permanent custody of the child. The answer included a notarized verification of Vicki's signature, but neither document was verified.

¶ 8    On March 19, 2010, Vicki requested an attorney to be appointed for her based on her low income. The trial court responded by supplying a "298 Petition" for Vicki to complete, advising her that based on the materials she had submitted, it appeared that she would not qualify for appointment of counsel, but that no decision would be made until she had submitted the petition. The trial court also provided Vicki with the contact information for several low-cost legal service organizations.

¶ 9    On April 26, 2010, the court entered an order giving Aaron and Jennifer leave to file an amended petition by May 17, 2010, giving Vicki until June 14, 2010, to file an answer or otherwise plead, and continuing the matter to June 28, 2010, for a status hearing.

¶ 10    On May 13, 2010, Aaron and Jennifer filed an amended petition to adopt the child, adding depravity as a second ground for finding Vicki unfit. Attached to the amended petition was an order issued by the El Paso County district court in Colorado on April 28, 2006, incorporating the transcript of a "Permanent Order Hearing" before that court on March 15, 2006.

¶ 11    During the hearing, the Colorado court considered a report prepared by Dr. George Nicholos, a clinical and consulting psychologist. To the extent that there were any issues concerning credibility, the court specifically found that the testimony of Dr. Nicholos was more credible than the testimony of Vicki on any matters in which there was a conflict. The court further found that Dr. Nicholos had carefully weighed the effect of his recommendations on the child and that "any parenting time other than what is specifically proposed by Dr. Nichol[o]s would endanger [the child's] physical health and would significantly impair[ ] [the child's] emotional development." Accordingly, the court ordered that all of the recommendations made by Dr. Nicholos be adopted and incorporated into the court's order. With regard to supervised visitation, the court ordered the parties to develop a "Parenting Time Plan" consistent with Dr. Nicholos' recommendations.

¶ 12    Also attached to the petition were the 13 recommendations made in Dr. Nicholos' report and adopted by the Colorado court. Dr. Nicholos recommended: (1) that Aaron have sole parental and decision-making responsibility for the child and wherever possible should try to communicate with Vicki in order to obtain her opinions concerning the child; (2) that the child live primarily with Aaron in Illinois; (3) that Vicki's parenting time initially be supervised; (4) that the court appoint a child and family investigator or parent coordinator to monitor and facilitate the progress of the case; (5) that Aaron remain in the role of primary parent with sole decision-making responsibility even if Vicki progressed to fully unsupervised contact with the child; (6) that Vicki abide by the decisions and directives made by Aaron concerning the child, including not pressuring or undoing any of Aaron's positions or philosophies with the child; (7) that Vicki immediately begin intensive individual psychotherapy with a therapist experienced in substance abuse and consult with a psychiatrist

---

[1]The objection was not filed *pro se*, but was signed by an "attorney-in-fact."

about the possibility of intervention with mood-stabilizing or antidepressant medication; (8) that Aaron provide Vicki with all significant medical, psychological, school, or social information about the child as reasonably soon as it becomes available; (9) that Aaron agree that under emergency circumstances, Vicki may sign legal releases for medical treatment or to take other necessary measures; (10) that each party promptly notify the other of any changes in addresses or phone numbers; (11) that whenever possible, Aaron and Vicki communicate via email; (12) that neither party discuss any legal matters with the child related to the case or any disputed financial matters; and (13) that telephone access be unlimited for the child between the two households, but that the child never be pressured or coerced into speaking with either parent, and that at the beginning of the parenting plan, Vicki be allowed to call the child no more than twice per week.

¶ 13     On June 21, 2010, Aaron and Jennifer filed a motion to strike Vicki's pleadings and for entry of a judgment order of adoption. The motion stated that Vicki's answer and objection to the petition did not comply with Illinois law since they were not verified and did not include the required filing fee. The motion further stated that the sheriff of Jefferson County, Colorado, was unable to serve Vicki with Aaron and Jennifer's amended petition at the address she included on her pleadings. Consequently, Aaron and Jennifer asked that Vicki be held in default and that a judgment order be entered as adoption was in the best interest of the child.

¶ 14     On the same day, the GAL filed a report recommending that the court enter a judgment of adoption as being in the best interests of the child. Also on the same day, the trial court entered an order granting Aaron and Jennifer's motion, striking Vicki's pleadings, entering a default against her, and terminating her parental rights. The trial court entered a separate judgment order of adoption finding Vicki "unfit to have the care, custody and control of the minor on the grounds of abandonment and failure to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." The court further ordered that the prayer for adoption be granted as it was in the best welfare and interests of the child.

¶ 15     On July 20, 2010, Vicki, through her attorney, filed a motion to vacate the default and the judgment order of adoption. The motion stated that Vicki had been representing herself, and that she came to court on June 28, 2010. When she arrived at court, she discovered that an order of default had been entered for failure to file proper pleadings; Vicki claimed that she did not understand what default was or that she had filed incorrectly. Vicki further claimed that she had called the clerk of the court and was told that she did not need to appear for a motion set on June 21, 2010. Vicki claimed that she did not receive the order of default until she appeared for trial.

¶ 16     On July 26, 2010, the court vacated the order of default and the judgment order of adoption, and set the matter for a hearing on the motion for default on August 24, 2010.

¶ 17     On July 30, 2010, Vicki filed a motion for leave to file a response to the adoption petition and to copy the court file, which the trial court denied on August 2, 2010, as premature until the court ruled on the motion for default and for entry of a judgment order of adoption.

¶ 18     On August 9, 2010, Vicki filed a motion for leave to file a response to Aaron and Jennifer's motion to strike Vicki's pleadings, which was granted on August 16, 2010. In her

response, Vicki admitted that she did not pay the required fee for filing her pleadings, but stated that she had not been aware of the fee and now had an appearance on file and had paid the fee. She claimed that she had planned to represent herself at the July 28, 2010, hearing[2] and did not understand that the motion set for June 21, 2010, canceled the hearing set for July 28, so she appeared on July 28 and discovered the judgment order of adoption had been entered on June 21.

¶ 19    Vicki claimed that her pleadings should not be stricken and that a default should not be entered because she suffered from the disabilities of depression and attention deficit disorder (ADD); she claimed that due to these disabilities, she received a disability check from the Veterans' Administration (VA), which has found her to be 80% disabled. Vicki claimed that these disabilities made it difficult for her to understand and process the proceedings. Vicki further claimed that an adoption would not be in the child's best interest since she had been the child's caregiver for the first three years of his life and had maintained regular contact since then. She claimed that since Aaron already had sole custody of the child, "there is no reason for an adoption other than the elimination of the mother from the child's life."

¶ 20    On August 23, 2010, Aaron and Jennifer filed a reply to Vicki's response. They stated that there was never a hearing set for July 28, 2010, but there was a status hearing set for June 28. They claimed that they filed the motion to strike on June 3, 2010,[3] and Vicki received notice of the hearing and in fact on June 21, called the court, the office of the GAL, Aaron and Jennifer, and Aaron and Jennifer's attorney, asking for information about " 'the next court date.' "

¶ 21    On August 24, 2010, the trial court denied Aaron and Jennifer's motion to strike and for entry of a judgment order of adoption, instead ordering the matter to proceed to a termination hearing.

¶ 22    On September 30, 2010, Aaron and Jennifer filed a motion, which the GAL joined, seeking an order requiring a mental examination and random drug testing of Vicki. The motion claimed that Vicki had placed her mental health into issue in the case, since her defense against the default was her testimony about disability findings made by the VA and certain drugs she consumes, which she testified explained her prior inconsistent and false testimony under oath.

¶ 23    On November 29, 2010, the trial court entered an order granting Aaron and Jennifer's motion for drug testing and for a psychological evaluation, ordering Vicki to submit to a psychological evaluation to address her alleged ADD and drug use and her ability to parent,

---

[2]Although Vicki's response lists the date as July 28, 2010, the record indicates that the hearing was on June 28, 2010, which is the date that Vicki earlier stated she appeared before the court.

[3]There is a notice of motion in the record stating that it was sent on June 3, 2010, but the file-stamp indicates that it was filed on August 24, 2010. The document is labeled as an "exhibit," but it is not clear what the exhibit relates to, as the document preceding it in the record is a court order.

and ordering Vicki to submit to random drug testing, to take place in Colorado.

¶ 24　　On January 3, 2011, the court entered an order continuing the case "for the execution of a Final and Irrevocable Consent to Adoption by Respondent, Vicki ***." No such consent was ever filed.

¶ 25　　On January 18, 2011, Aaron and Jennifer filed a motion to compel Vicki to respond to outstanding discovery and to impose sanctions against her for failure to respond to discovery. On the same day, they also filed a motion for rule to show cause why Vicki should not be held in contempt for failing to complete the psychological examination or comply with the random drug testing ordered by the court.

¶ 26　　On February 7, 2011, the trial court entered an order granting Aaron and Jennifer leave to file a second amended petition to adopt; ordering the parties to have no contact with each other; and ordering the parties not to be given information as to current residences or places of work as disclosed in any discovery responses given to counsel.

¶ 27　　On February 17, 2011, Aaron and Jennifer filed a second amended petition to adopt the child. The second amended petition was identical to the amended petition, except that Aaron and Jennifer were no longer listed as married persons but as single persons; the petition stated that Aaron and Jennifer recently divorced, but would continue to share parenting responsibilities for the child.

¶ 28　　On March 22, 2011, Vicki filed a motion to dismiss the second amended petition pursuant to section 2-619(d) of the Code of Civil Procedure (735 ILCS 5/2-619(d) (West 2010)), claiming that since Aaron and Jennifer were no longer married, the adoption was no longer a "related adoption" and they could not adopt the child since he was not "available for adoption."

¶ 29　　On March 28, 2011, Aaron and Jennifer filed an emergency motion seeking court intervention to terminate Vicki's "harassment campaign" against Aaron. The motion claimed that beginning on March 24, 2011, a person named Gordon Hansen began contacting the councilmen and mayor of a city in Illinois[4]; Aaron is also a councilman in the same city. The motion further claimed that Hansen falsely identified himself as a " 'court-appointed investigator' " investigating Aaron's ethics. Hansen "falsely created the impression" that Aaron was the subject of a criminal investigation and indicated that he was a court-appointed investigator as to a family court matter involving Vicki. He asked the councilmen whether they knew of any criminal activity involving Aaron, knew of his business activities, or knew of any police reports. The motion claimed that this conduct was in violation of the February 7, 2011, court order barring the parties from contacting each other.

¶ 30　　The motion claimed that after learning of Hansen's conduct, Aaron contacted him at the telephone number he had provided the councilmen. Hansen told him that he had been retained by Vicki's attorney. The motion asked for the court to hold Vicki and her counsel in contempt, to strike Vicki's pleadings, to hold Vicki in default, and to enter the judgment order of adoption.

---

[4]For the sake of protecting the child's identity, we do not name the city.

¶ 31    On April 4, 2011, the trial court entered an order denying Aaron and Jennifer's request for a contempt order, taking their request for an order striking Vicki's pleadings under consideration, and denying Vicki's motion to dismiss the second amended petition for adoption.

¶ 32    On April 25, 2011, the trial court entered an order in which it, *inter alia*, denied Aaron and Jennifer's motion to strike Vicki's pleadings.

¶ 33    On May 26, 2011, the GAL filed an emergency motion for sanctions, claiming that Vicki had recently "unleashed a series of offensive and intrusive comments" on social media Web sites in violation of the court's orders.

¶ 34    On May 26, 2011, the trial court entered a temporary restraining order against Vicki, barring her from contacting Aaron or his businesses by any means, including through social media Web sites; the restraining order also applied to contacting Aaron's business associates, employees, and Web sites.

¶ 35    On June 6, 2011, the court denied Aaron and Jennifer's motion for a contempt order and ordered that Vicki have no contact by any means, directly or indirectly, with Aaron or Jennifer, the child, Aaron's businesses, or Aaron's family, friends, employees, associates, vendors, and business sources. The court further ordered Vicki to immediately remove all Internet postings concerning herself, the child, or Aaron.

¶ 36    Subsequently, the trial court again entered a number of orders for Vicki to immediately remove all references to Aaron, Jennifer, or the child from the Internet and to request members of her friends and family to do the same.

¶ 37    On February 14, 2012, the court entered an order on Aaron and Jennifer's motion *in limine*, barring Vicki from, *inter alia*: (1) attacking the custody order entered by the El Paso County district court in Colorado or from attempting to relitigate the case that produced the custody order; and (2) attacking the parental evaluation and recommendations of Dr. Nicholos, which were adopted and incorporated into the custody order entered on March 15, 2006.

¶ 38    On March 1, 2012, the GAL filed a motion for sanctions against Vicki for her failure to remove materials referencing the child from the Internet, despite at least four prior court orders to do so; the GAL also noted that at least one of the references to the child was posted after the first court order was entered.

## II. Trial

¶ 39

¶ 40    On March 1, 2012, the parties came before the trial court for trial, which lasted 10 days.

### A. Aaron

¶ 41

¶ 42    Aaron testified on his own behalf that he was formerly married to Jennifer and had three children: the child, who was eight; and two children, ages six and three. He further testified that he held three political positions, including a position as councilman of the city in which he resided. He also owned a number of entrepreneurial businesses, most of which he owned outright and some of which he owned as a partner. Aaron testified that despite being

divorced, he and Jennifer continued to parent the three children together, constantly communicating and even having family dinners together several times during the week; he testified that during their divorce, they "worked it out between ourselves" and came up with a co-parenting agreement.

¶ 43 Aaron testified that he had been involved in judo and was accepted at the Olympic Training Center (OTC) in Colorado Springs and met Vicki in early 2001 while living at the OTC. He was 22 or 23 at the time, and had recently graduated from college. While he was at the OTC, he also became employed by an event production company that produced mixed martial arts events, and he competed in some of their events. Additionally, Aaron served as an announcer for the company's oil wrestling events. Aaron testified that there would always be one or two women hired "to make sure that we had a show," and some women would be selected from the crowd, which was predominantly male.

¶ 44 Aaron testified that he first met Vicki at one of the company's events and spoke to her afterwards at the bar. They went back to her home that evening and went on "probably two or three dates and *** that was probably the whole thing of that." Aaron testified that they had a sexual relationship, which began on their second or third date. Aaron testified that during that time, he was immature and it was not uncommon for him to date several people at the same time.

¶ 45 Aaron testified that his sexual relationship with Vicki lasted "[a]t most two weeks" and that he believed that Vicki "liked" him. Aaron testified that Vicki participated in the oil wrestling once, although he never asked her to do so. When he told her that he was no longer interested in "continu[ing] on with hanging out with her," she began visiting the OTC at random hours and placing letters and notes underneath his door; she also began coming to his events and even came to a house that Aaron was house-sitting. Aaron testified that there were times that he needed to ask security at the events to not allow her to enter or to have her removed; Aaron classified her behavior as "a bit scary." A few months after the relationship ended, Aaron left Colorado to move back to Illinois. He learned about 2½ years later, when obtaining an emergency order for custody, that Vicki claimed that he had raped her.

¶ 46 Aaron testified that he was still in Colorado, teaching at a martial arts studio, when Vicki interrupted his class to tell him that she was pregnant and he was the father of the child. He asked her to let him finish his class and they would discuss it. Aaron testified that when Vicki told him she was pregnant, he did not believe her; he thought it was a way for Vicki to attempt to rekindle their physical relationship. He purchased another pregnancy test and asked her to take the test; it was positive. She asked him to go with her to the doctor, which he did, and the doctor confirmed that she was pregnant and conception occurred at approximately the time Aaron and Vicki had their relationship. Aaron and Vicki had a discussion about whether to terminate the pregnancy, and Aaron told Vicki that it was her decision to make. He told her that he would be a supportive father, but that he was not interested in any other kind of relationship with Vicki.

¶ 47 Aaron testified that Vicki asked him several times for money to obtain an abortion. He asked her where she was planning on having the abortion, and he sent a money order made out in the name of the clinic to her. She sent it back to Aaron's parents in Illinois. Vicki then

asked for $1,000 for an abortion at Planned Parenthood, which Aaron provided, made out to Planned Parenthood; he testified that Vicki wanted the money order made out to her, which was "never *** going to fly." Aaron did not hear from Vicki until two to three weeks before the child was born, when Aaron was back in Illinois; it was at that time that Aaron learned Vicki was still pregnant.[5] When Aaron learned that Vicki was going to give birth, he made plans to visit the child in California, where Vicki was living.

¶ 48    Aaron testified that he did not attend the child's birth because he was not clear on when exactly he would be born, but that the hospital sent him photographs after the birth and he immediately made plans to visit San Francisco; he went to San Francisco less than three weeks after the child was born. After the child was born, Aaron obtained records from the hospital about his birth, which included a medical report. The report mentioned several risk factors involved with the child's birth: "[Vicki] has significant cycle social risk factors, including depression. She has psychiatric hospitalizations in the past. She has an assault charge outstanding in Colorado and no contact at this time with the father of the baby." The report also stated that prenatal care was questionable: "Prenatal began at 25 and [2]7 weeks and was complicated by; 1, history of multidrug overdose; 2, history of psychiatric hospitalizations; 3, late prenatal care; 4, difficult blood draw." The report also included a plan for Vicki upon the child's birth: "1, a social service consult for mother, maternity history of drug overdose and psychiatric problems and poor health condition."

¶ 49    Aaron testified that after the child was born, he wanted to be legally declared the child's birth father and have his name on the child's birth certificate. Vicki had given the child a name that included Aaron's middle name, which was also his father's first name, and his last name. Aaron and Vicki met with Vicki's father, who was an attorney, and tried to come to an agreement as to visitation and child support. Vicki's father drafted an agreement, and Aaron said that he needed his attorney to review it before he signed anything. The agreement was never signed, because Aaron's attorney felt that it was not a fair agreement and needed modification. After Aaron told Vicki that he wanted to redraft parts of the agreement, she informed him that during her pregnancy, she had met a man named Joel S., and that they were moving and were no longer interested in having Aaron as part of the child's life.

¶ 50    Aaron testified that several times, Aaron and Jennifer made plans to visit the child in California; Vicki was initially open to the plans until she discovered Jennifer was planning on coming, at which point she canceled the plans. Aaron testified that Vicki tried to prevent him from having a relationship with the child by refusing contact with him and not being available due to her "nomadic lifestyle" and constant moving.

¶ 51    "[A]while later," Aaron visited the child in Missouri. Aaron testified that he had made arrangements to fly Vicki and the child to Illinois so that he could meet Aaron's family, but Vicki changed the tickets that Aaron had purchased to Missouri and informed Aaron that if he and his family wanted to visit the child, they would need to drive to Missouri, where she was staying with her grandparents. Aaron, his mother, and Jennifer went to Missouri to visit the child, and they had the opportunity to spend several days with him. Aaron believed that,

---

[5]Aaron testified that the second check–to Planned Parenthood–was never returned.

at that time, Vicki had married Joel.

¶ 52    Aaron testified that he began several court cases to establish parentage of the child. He testified that, in relation to a case he had filed in California, he was ordered to submit to a DNA test, which he did. He was required to submit to a DNA test twice more, because Vicki never completed her portion of the testing. Finally, the case was dismissed due to Vicki's failure to cooperate. At that point, he contacted someone who worked at the place where Vicki kept a post office box, and that person told him that her forwarding address was in Hawaii. Aaron discovered that in 2004, Vicki and Joel left California and moved to Hawaii. Aaron testified that when he learned that Vicki had moved to Hawaii, he hired an attorney and attempted to establish parentage there, but was not successful because she was unable to serve Vicki after a number of attempts.

¶ 53    In 2005, Aaron began a "wide net search" for the child, contacting different police departments in areas where Vicki had ever lived to obtain her address. As a result, Aaron obtained a number of police reports and incident reports where Vicki and Joel had domestic disputes.

¶ 54    On Memorial Day weekend of 2005, Vicki contacted Aaron at approximately midnight. She told him that she and the child were at a halfway house or shelter in Missouri and needed to come to Illinois because she had nowhere else to go, and she requested a bus ticket. Aaron immediately contacted the bus terminal and paid for a bus or train ticket and picked them up at the station. When they arrived, the child appeared to be in "okay" condition, and Vicki had 10 to 12 bags. He took them to a hotel near his home and rented them a room. Aaron testified that when the child arrived, the child "had a hard time talking" due to a speech delay and also had significant tooth decay.

¶ 55    On May 30, 2005, Aaron and Vicki signed a voluntary acknowledgment of paternity, which Aaron asked Vicki to sign when she came to Illinois from the shelter. On May 31, Aaron filed a complaint in the circuit court of Cook County to determine the existence of a parent/child relationship and also included a request for custody.

¶ 56    The same day that Aaron filed the complaint, he and Vicki had a confrontation at a grocery store. Vicki informed Aaron that she and the child only ate organic food, but she had no money and needed food, so Aaron took Vicki and the child to the grocery store. Aaron testified that Vicki picked out items that she would not be able to store in her hotel room, since it did not have a refrigerator, including a gallon of milk, and when Aaron told her so, she turned to the child and showed him the milk, screaming, "do you see what your dad doesn't want to get for you? Do you see this? You're not good enough for your dad to get this for you because he doesn't care about you." Aaron "lost [his] cool" and became extremely upset. He picked up the child and called the police while leaving the grocery store.

¶ 57    Later that day or the next day, Vicki was served with the parentage complaint. Aaron was not present when she was served, but his mother was. After Vicki was served, she contacted her brother, Alan H., who picked her and the child up and drove her back to Colorado. The parentage action was later moved to Colorado.

¶ 58    Aaron testified that a few months later, he traveled to Colorado after being contacted by Vicki's brother Alan. After speaking with Alan, Aaron determined that Vicki was in jail.

Aaron spoke to his attorney, who recommended obtaining an emergency order to remove the child, which Aaron did. Once the emergency order was obtained, Aaron, Jennifer, and Aaron's parents drove to Colorado, where they were met by Aaron's attorney, who contacted the police department to attempt to locate the child. The police located the child at Vicki's mother's house, presented her with the emergency order, removed the child, and gave the child to Aaron. Aaron and his family then took the child back to Illinois.[6] Aaron testified that immediately upon returning to Illinois, he took the child to a pediatrician to have him examined, and the pediatrician stated that the child had speech delays.

¶ 59    While Aaron was waiting for the police to return with the child, he heard that Vicki had contacted the police and wanted to file a rape charge against Aaron for the encounter that resulted in conception of the child. Upon his return to Illinois, Aaron was contacted by the Illinois Department of Children and Family Services (DCFS). The inspector from DCFS examined the child and told Aaron that there were allegations that Aaron was slicing the child's feet.

¶ 60    Aaron testified that, while driving back from Colorado, he had noticed splinters in the child's feet. Vicki called him, wanting to speak to the child, and Aaron asked her why the child had splinters in his feet; Vicki responded that he had been running on a deck and perhaps got them there. The DCFS report against Aaron was ultimately deemed unfounded. Aaron requested that DCFS save the record of the unfounded report in case it was ever necessary.

¶ 61    At approximately the same time in July 2005, Vicki sought and obtained civil orders of protection against Aaron and her brother Alan. Vicki also accused Aaron of sexually abusing the child, resulting in Aaron being contacted by the police, who determined that the report was unfounded and "blatantly false." DCFS also investigated the matter, finding the report unfounded, and advised Aaron that the reports against him were "probable[ ] intentionally false reports."

¶ 62    During that time, Aaron was investigating Vicki on his own due to the custody case they were involved in. He contacted all of the hospitals and police departments in the areas he believed Vicki had lived, getting any information that was available; he also performed Internet searches. Aaron testified that he received a number of incident reports involving Vicki. Additionally, as a result of his investigation, he had concerns about drug usage by Vicki. Aaron testified that he knew when he met Vicki that she used marijuana, but he was also sent a videotape by Joel of Vicki and Joel using drugs while the child was present, and he was aware that Vicki's drug testing consistently was positive for marijuana and some form of amphetamine. Aaron further testified that, based on his research, Vicki supported herself by working as an exotic dancer in multiple states; he testified that her work did not concern him because she did not do it in the presence of the child.

¶ 63    Aaron testified that he made a report to Colorado Child Protective Services concerning Vicki and Chris, Vicki's boyfriend, and that the resulting report, completed in October 2005, was inconclusive and stated that there did not appear to be any child protection issues. Aaron

---

[6]The child was returned to Vicki in Colorado shortly thereafter.

testified that he made the complaint based on the child telling him that Chris had hit him.

¶ 64 Aaron testified that when the custody case began, his and Vicki's attorneys negotiated that during the pendency of the proceeding, Aaron would fly to Colorado to pick up the child, return to Illinois with him for 12 days, then fly the child back to Colorado for the child to spend the next 12 days with Vicki.

¶ 65 During Christmastime in 2005, Aaron had a conversation with Vicki in which they were discussing their plans for the holiday. Vicki informed him that she did not believe in Christmas or holidays because they were against her beliefs and she did not want the child to participate in any Christmas activities. Aaron informed Vicki that he had planned to take photographs for Christmas, and when he went to pick up the child for his visit, discovered that Vicki had shaved the child's head "completely to the skin." Vicki told Aaron that the child had gum in his hair and that she was not happy that Aaron was planning on taking Christmas pictures.

¶ 66 Aaron testified that in February 2006, he took the child to a dentist. In order to do so, Aaron petitioned the court in Colorado because Vicki objected; Aaron testified that Vicki informed him that if he had the dental work completed, she would have it removed when the child returned to Colorado. He testified that she wanted to take a holistic approach to the child's dental work and felt that the materials the dentist was planning to use were not appropriate. Ultimately, Aaron was permitted to have the dental work performed, which he did during one of the times that the child was with him in Illinois. The dentist needed to place 2 crowns and fill 10 to 12 cavities; the child was approximately three years old at the time. Aaron testified that the dental work cost several thousand dollars, which he paid.

¶ 67 Aaron testified that once, during the pendency of the custody case, he was contacted by Joel, Vicki's ex-husband, who sent Aaron materials Joel thought would be relevant to the case. Based on that material, as well as material he received from the VA, Aaron determined that Vicki had attempted suicide twice. He also determined that she was institutionally hospitalized for psychiatric treatment twice.

¶ 68 The Colorado court proceedings ended in the court awarding Aaron sole custody over the child. The court's decision was based on the report of Dr. George Nicholos; Aaron testified that Dr. Nicholos observed the child in person with his shaved head and included that information in his report. Aaron also testified about compliance with Dr. Nicholos' recommendations, which were adopted by the court. Aaron first testified that Vicki was entitled to supervised visitation, but that parenting time was ultimately suspended. Next, the court recommended that the court appoint a child and family investigator or parent coordinator to monitor the progress of the case; Aaron testified that Randy Schaffer was designated as the coordinator. When Aaron spoke to Schaffer, Schaffer informed him that he needed a retainer, and Aaron immediately sent a check to him. Schaffer held the check for six months while waiting for Vicki to send her portion of the retainer. When Vicki did not send a check, Schaffer returned the check to Aaron with a letter stating that he had never received any information from Vicki nor did he receive her portion of the retainer.

¶ 69 Aaron also testified that the court ordered that Vicki was to abide by Aaron's decisions concerning the child, but she disagreed with him on nearly all of his decisions. She was also

ordered not to pressure the child or undermine any of Aaron's positions or philosophies with the child, but did so by telling the child on the phone that he did not need to listen to what Aaron or Jennifer said and that Jennifer was not his mother. Aaron further testified that initially, he kept Vicki informed about the child's activities and health, as required by the court order, but Vicki was hostile or made demands. "[A]fter awhile," Vicki lost interest and did not call or ask about anything. He testified that although she was not barred from doing so, Vicki did not attend the child's school events or contact the child's school or doctors; he testified that in the last six years, she contacted the child's teacher once. He further testified that Vicki never moved to Illinois, where the child resided, but instead lived in a number of other states, including California, Missouri, and Colorado.

¶ 70    Aaron testified that after the Colorado case ended, Vicki was awarded telephone visitation time and she did a "pretty good diligent job" in calling the child twice a week for the first year. After that, her telephone calls became "sporadic at best." The telephone calls were also sometimes inappropriate and were made outside of the times scheduled for Vicki to call.

¶ 71    Aaron acknowledged that there were times when he terminated her telephone calls. He explained that at the beginning, the child was very young, and he would sometimes be disinterested in taking a telephone call, so Aaron and Jennifer would suggest things for him to talk about. After some time, Vicki objected, claiming that they were telling the child what to say, so they stopped doing that and simply handed the phone to the child. Sometimes, the child would tell Vicki that he needed to do something else, and Vicki would raise her voice, so Aaron and Jennifer would end the conversation. Additionally, they ended conversations when she began saying things like that Santa Claus did not exist, when Vicki raised her voice or "something crazy" was occurring in the background, or when Vicki's speech was slurred; Aaron explained that the telephone conversations were on speakerphone, so he or Jennifer was able to monitor the phone calls.

¶ 72    Aaron testified that in addition to phone visitation time, Vicki was awarded supervised visitation time. Visitation occurred three times, the first time in Illinois and the second and third times in Colorado. Aaron testified that the first time, he and his attorney believed it was in the child's best interest to have the supervised parenting time, so Aaron covered the expense. The second time, he again felt it was in the child's best interest, and Vicki could not afford it, so Aaron covered the expense of the visitation. Both Aaron and Vicki were present with the child, along with a supervisor and one of Vicki's friends. Aaron dropped the child off and the supervisor brought the child inside. Less than 10 minutes later, the supervisor called Aaron and asked him to return to pick the child up. When Aaron returned, the supervisor was waiting outside. She told Aaron that Vicki was inside with the child, who was refusing to behave; Vicki would not let go of the child and the supervisor had contacted the police, who took the child from Vicki and returned him to Aaron, who then left with the child.

¶ 73    The third visitation took place through a nonprofit organization called CASA, which Vicki had contacted. After that visit, Aaron received a notice from the organization and supervised visitation ceased.

¶ 74   Aaron also testified about a number of times that Vicki had called him or sent him text messages that resulted in his contacting the police. On July 13, 2005, he received a phone call from Vicki in which Vicki yelled at him and spoke to him in a threatening manner. In November 2006, Vicki sent threatening text messages to Aaron and Jennifer. On May 18, 2010, Vicki called Aaron and raised her voice and cursed at him.

¶ 75   Aaron testified that on June 16, 2010, he complained to the police about a person named Mickey Windecker after he contacted Aaron by telephone. He also did independent investigation to discover who Windecker was, including accessing Colorado's online court system to obtain Windecker's criminal history, and determined that Windecker was a "convicted child molester." Aaron testified that Vicki gave Windecker Aaron's personal and business addresses, as well as his email and phone number. After doing so, Aaron purchased a security system and a shotgun.

¶ 76   Aaron testified that it had been over five years since Vicki had seen the child and that she had spoken with the child "[o]n and off." Aaron further testified that Vicki was to pay child support to Aaron, but was currently approximately $14,000 in arrears. Aaron testified that Vicki's sources of income were a disability check from the government and her work as an exotic dancer. Vicki traveled across the country for her exotic dancing and had sent the child two or three gifts, the last sent several years ago; Aaron testified that the gifts Vicki sent were used clothing or toys that were not age-appropriate. Aaron also testified that Vicki did not pay for expenses for which she was obligated to reimburse Aaron, such as the cost of the supervised visits or her portion of the child's medical expenses.

¶ 77   Aaron testified that, over a period of time, he and Vicki had exchanged emails about each other and about the child and that, sometimes, he had sent inappropriate emails and called Vicki "very bad things"; Aaron further testified that he had behaved immaturely and regretted those emails. He testified that he and Vicki had not been in contact for at least two years.

¶ 78   Aaron testified that Vicki informed him that she would consent to the adoption and that, in fact, the adoption case began because Vicki and her attorney approached him. Vicki's attorney contacted Aaron in 2009, after which Aaron began to make preparations for Vicki to execute a consent to the adoption. Aaron hired an attorney for himself and Jennifer, and also hired an attorney to represent Vicki. However, Vicki never returned a signed consent form to Aaron.

¶ 79   Aaron testified that at one point during the pendency of the adoption case, other councilmen were contacted about him. Two of them contacted Aaron and informed him that they were approached by an investigator from the Cook County State's Attorney's office concerning Aaron; Aaron testified that there was no ongoing investigation about him. Aaron testified that there was a hearing concerning this contact, in which another councilman testified that he was contacted by someone holding himself out to be a private investigator. After the hearing, the contact ceased.

¶ 80   Aaron testified that Vicki has posted photographs of the child on the Internet. He observed them through social media Web sites such as Facebook, Twitter, and Myspace, and through her blogs. Aaron testified that he cared that the child's photograph was on the

Internet because he "felt like it was being used in a derogatory manner." For instance, on Myspace, it said that the child "has been stolen or betrayed" and attempted to portray the child's points of view, which Aaron thought was unacceptable, since Vicki did not know what the child was thinking. He further testified that often, the photographs would be located next to a link to Vicki's blog, where she made false accusations against Aaron. Aaron testified that the photographs were available as recently as July 21, 2011. He testified that he was able to access the Myspace photographs by creating a profile and contacting Vicki, who accepted the "friendship," giving Aaron access to the photographs.[7]

¶ 81    Aaron also testified that he had visited Vicki's blog and testified about several entries. Aaron testified that Vicki had a blog entry in which she referred to Aaron, Jennifer, and the child. The blog stated that he and Jennifer yelled at Vicki on the phone several times, which he denied, and also stated that Vicki had told the child that elves were fictional, which Aaron confirmed that she had done; the blog also discussed Vicki's complaints about Santa, elves, the Easter Bunny, and Snow White.

¶ 82    Another blog entry was entitled "power and lies" and contained links to a number of Web sites, including Aaron's campaign Web site, his old Myspace Web site, and his companies' Web sites. Vicki commented on the blog entry, "what BS."

¶ 83    Another blog entry was dated May 19, 2009, and was entitled "conception." Aaron testified that the entry contained a large amount of false information about him, including that Vicki told him that she did not wish to have sex with him and that he did so anyway, pinning her down and covering her mouth.

¶ 84    Aaron testified about the contents of another of Vicki's blogs. He denied Vicki's claims in the blog entry that he hurt her physically, told her he wanted to rape her, or sexually abused the child. Aaron testified that he did, in fact, make a complaint about Chris H., Vicki's boyfriend, as stated on the blog. Aaron explained that during his investigation on the custody case, he discovered information about Chris's background and complained to the court and to Dr. Nicholos. He testified that he was informed that at some point, Chris died in an accident, but denied having anything to do with the accident, as Vicki claimed in the blog entry.

¶ 85    Aaron testified that information with the child's name, such as Vicki's blogs or the child's photographs on social media, was easy to find on Google, because his first name was spelled in an unusual manner and his middle name was unique. Aaron testified that to the best of his knowledge, this information was still available on the Internet.

¶ 86    Aaron testified that there were a number of other blogs and photographs available through Vicki's Myspace profile. Aaron further testified that one of her blog entries referenced Vicki contacting Aaron's friends on Facebook and Twitter. During the pendency of the adoption case, Aaron became aware of Vicki's negative postings about him on Twitter and that she had contacted his Twitter contacts. Once Aaron became aware of them, he obtained a court order temporarily restraining that conduct.

---

[7]The GAL noted that she was able to access the photographs without creating a profile by performing a Google search.

¶ 87      Aaron then testified about Vicki's postings on Facebook. He testified that she created a public profile in the child's name, which included negative comments about Aaron and links to articles about him, and included photos and video of the child.

¶ 88                                 B. Jennifer

¶ 89      Jennifer also testified on her own behalf. Her testimony was substantially the same as Aaron's testimony. She testified that when Aaron returned from Colorado, they rekindled their previous relationship.

¶ 90      Jennifer testified that in 2005, she, Aaron, and Aaron's mother drove to Missouri to visit the child after Vicki had changed the destination on the plane tickets that Aaron had purchased for Vicki and the child; at that point, Jennifer and Aaron were still dating.

¶ 91      Jennifer testified that in April 2004, Aaron and Jennifer were planning on going to San Francisco for the child's first birthday. Vicki had been communicating with Aaron via email and had extended an invitation for him to come. When they arrived and Vicki discovered that Jennifer had accompanied Aaron, she did not permit Jennifer to see the child. At about this time, Vicki married Joel, who was in the military. Jennifer testified that they lived either in Missouri or California, but then moved to Hawaii. Vicki and Joel sporadically communicated with Aaron and Jennifer, but Vicki sent one photograph of her, the child, and Joel that she labeled "[the child], his mommy and his daddy."

¶ 92      Jennifer testified that around Memorial Day 2005, they discovered that Vicki was no longer married to Joel. Jennifer was approximately six months pregnant and living with Aaron in Illinois. "[V]ery late in the night," after not hearing from Vicki for "awhile," Aaron received a call from Vicki saying that she was in a shelter in Missouri and had nowhere to go and asking if he would purchase a ticket for her and the child to come to Illinois. Aaron immediately called the train station and purchased a ticket on his credit card; Aaron picked them up and found them a hotel room. Jennifer testified that this was the first time the child had been in Illinois.

¶ 93      Jennifer testified that while they were parenting the child, she searched for the child's name on Google as a precautionary measure. She discovered photographs of Vicki in compromising and provocative positions and "ongoing rants" that Jennifer knew were fabricated. Jennifer further testified that in investigating Vicki, to gain access to Vicki's Facebook and Myspace accounts, she and Aaron created a fictional "dummy" account and requested Vicki as a "friend"; Vicki accepted, so they had access to her postings in those accounts. Jennifer testified that Vicki posted information about getting her hair done, eating out, and traveling at the same time that she was not paying any child support.

¶ 94      Jennifer testified that she had received threatening texts from Vicki that she reported to the police.

¶ 95                                   C. Vicki

¶ 96      Vicki testified that in 1998, she joined the military, where she remained for 13 months until she received an honorable discharge. While she was in the Army, she had attempted

suicide; she was in a coma and remained in the hospital for two weeks, after which she was admitted to the Lackland Air Force Base Mental Health Ward for a week. After that, she left the Army. She remained in Texas for three years, then moved to Colorado to be near her mother; she attempted suicide again while she lived in Texas and prior to moving to Colorado.

¶ 97        Vicki testified that while she was living in Colorado, she met Aaron at a bar where Aaron arranged fighting events. She testified that she knew him for about two weeks and then, at the third event at which she saw him, a group of people including Aaron came to Vicki's home. The next day, Aaron took Vicki to the Renaissance Festival and throughout the week, Vicki went to events with him. Vicki testified that on August 1, she was "making out" with Aaron, but informed him that she was not ready to have sex, nor was she on birth control. Aaron placed his hand over her mouth, pinned her down, inserted his penis, and immediately ejaculated. Aaron immediately jumped up and began apologizing. Vicki became pregnant that night.

¶ 98        Vicki testified that after she discovered she was pregnant, she was "very civil" to Aaron and tried to be nice so that they would be able to raise the child together. Vicki testified that she went to the doctor and followed the doctor's advice, taking prenatal vitamins and stopping all medications. She testified that she went to the facility where Aaron was teaching a martial arts class and informed him that she was pregnant. He denied that she could be pregnant and purchased another pregnancy test and made her take it. He told her that he thought that it would be a good idea for her to have an abortion and she did not agree; he brought up the topic of having an abortion several times.

¶ 99        Vicki testified that after the child was born, she had him immunized, but once he was 15 months old, she had done research and determined that the immunizations were harmful and did not have him immunized further.

¶ 100        Vicki testified that after Aaron went back to Illinois, she moved in with her mother because Vicki became sick, then moved in with her father in California for a while. Vicki testified that Aaron first met the child in May 2003, when Vicki took the child to San Francisco to meet him. They met at her father's law office, and discussed a parenting agreement for several hours. Aaron said he would have his attorney look at the agreement, but never signed it.

¶ 101        Vicki testified that after Aaron refused to sign the parenting agreement, she filed a paternity case in Shasta County, California. When she initiated the case, she had a DNA sample taken for her and the child.

¶ 102        Vicki testified that Aaron indicated that he wanted to see the child for his first birthday, but would not provide Vicki with any definite plans, so Vicki made plans to take the child to see Joel's family several hours away.

¶ 103        Vicki testified that she married Joel on May 7, 2004, and in September 2004, they moved to Hawaii. Vicki called Aaron and informed him of the move. Vicki testified that her relationship with Joel was very affectionate and he was very supportive and protective of her. However, after they moved to Hawaii, Joel struck her; that was the first time he had been violent toward her. Vicki left for the night, but returned after Joel begged her to come back.

When she returned, she and Joel got into another argument and Vicki left again. Vicki testified that she and Joel separated and reunited several times. After she separated from Joel for the last time, she stayed in Hawaii for a while and became religious. Vicki testified that she left Hawaii in January 2005 and went to stay with her grandmother in Missouri.

¶ 104     Vicki testified that she tried to make a relationship with Joel work but that he was physically violent several more times; the child was never in the room when Joel was violent. Vicki denied attacking Joel with a potato peeler. Vicki testified that after she stayed at her grandmother's, she went to a women's shelter for one night because she was under the impression that there would be resources there for her and the child; she did not like it at the shelter. During that time, Vicki discovered that the child had seven cavities and needed work that would cost over $5,000. She decided to call Aaron and ask him if he would help with the child's dental problems. Her mother took Vicki and the child to the train station and Vicki and the child took the train to Illinois; Vicki testified that she had two small bags and two checked bags.

¶ 105     Vicki testified that Aaron took her from the train station to a jewelry store that he owned, where he had Vicki sign a voluntary acknowledgment of paternity in front of a witness. Later, after going to the hotel and Aaron's mother's house, Aaron, Vicki, and the child went to the grocery store. Aaron and Vicki argued about what the child should eat or drink and Aaron became angry at the child. He yelled at the child and spanked him and, when Vicki told him that was unacceptable, he picked up the child and took him, telling her that she was never going to see the child again. Vicki began yelling for security and Aaron handed the child back; someone called the police.

¶ 106     Vicki testified that she spoke to the police and they advised her to go to a shelter; Vicki did not want to go to a shelter, so she stayed at the hotel. The next morning, Vicki was served with a restraining order and an emergency order taking her child away. Vicki called her father in California, because he had been a lawyer, and she felt that he would be able to help her. Based on her father's advice, Vicki asked Joel to pick her up, and he took her and the child to Missouri, where Vicki met up with Alan, her brother. From there, Alan, Vicki, and the child drove to Colorado. For the next month, Vicki stayed with Alan. The first thing Vicki did when she got to Colorado was to find an attorney and transfer the case that Aaron had started to Colorado.

¶ 107     Vicki testified that she did not have any problems during that month until the last day. Vicki came home and Alan told her that she could not stay there any longer and was very upset with her; Alan informed her that there was a warrant for her arrest. That night, Vicki went to her mother's house and the next day, she left the child there so that Vicki could deal with the warrant for her arrest.

¶ 108     Vicki spent two days in jail because it was the weekend. Vicki testified that she learned there were two warrants for her arrest; one was for a speeding ticket in 2001 or 2002 for which she had failed to appear and the other was for three counts of assault. On Monday, she was released by a judge who sentenced her to time served for the ticket and assigned another court date for the assault charges. Concerning the assault, Vicki testified that in 2001, she was ticketed for a misdemeanor assault in Pueblo, Colorado, for an altercation between her

and three other people. Vicki signed a plea agreement and was told that as long as she did not get into trouble over the next year, she would not need to do anything further with the case. Vicki discovered that there had been a mistake in the Pueblo court and the plea agreement had not been properly filed; Vicki pled guilty to harassment and another plea agreement was entered.

¶ 109    A few days after being released from jail, Vicki took the child to her mother's house for the night. Her mother called Vicki and told her that the child had been taken. Vicki called Aaron several times, upset, and he told her that she would never talk to the child again. Vicki called her attorney, who was able to arrange a hearing on July 15, 2005; Aaron participated by telephone. The judge ordered the child returned to Vicki. When the child returned, he was wearing a diaper, which Vicki thought was odd, since he had been potty-trained prior to being taken by Aaron; he also had diaper rash.

¶ 110    Vicki testified that in November 2005, when the child returned from visiting Aaron, he had received his first haircut, and it was several different lengths and "unkempt and unruly." In December 2005, the child had gum stuck in his hair. Vicki attempted to remove it, but it was stuck all the way to the root, so she had his hair cut in a buzz cut; Vicki denied shaving the child's head.

¶ 111    Vicki denied making a complaint to DCFS about cuts on the child's feet. She testified that in January 2006, she picked the child up from the police station after a visit with Aaron. She noticed that he was timid and quiet and was very concerned about Chris, Vicki's fiancé; when Vicki told the child Chris was in a different corner, he ran to Chris and hugged him. Vicki also noticed that the child had cuts on his head, a rash around his mouth, and bruises on his legs. When they returned home, the child went to bed. Vicki was in bed the next morning when the child came into her room and jumped on her bed. The child asked her to "nurse him like mommy Aaron." Vicki told the child that they did not nurse anymore, but the child was upset and repeated himself. Vicki told the child that she did not know what he was talking about and for him to show her what he wanted. The child pushed her down on the bed, sat on top of her with his legs wrapped around her neck and his crotch in her face, and again said "nurse me like mommy Aaron." Vicki picked him up and moved him, but the child was upset. Vicki contacted DCFS in Colorado and asked them what she should do, and they suggested that it would be unwise for her to immediately report the incident, since Aaron had recently filed a report against Chris and had filed reports against her in the past and it would appear like she was filing the report in retaliation.

¶ 112    Vicki testified that between 2006 and 2010, she had a number of telephone conversations with the child. She testified that when Aaron or Jennifer was supervising the calls, they would be very short, but that when another family member was supervising, she would be able to talk to the child for up to half an hour without incident. Vicki testified that the telephone visitation stopped when Aaron told her that his attorney advised him not to let her have phone visitation, and Vicki has not spoken to the child since; Vicki could not remember the exact time visitation stopped, but believed it was in 2009 or 2010.

¶ 113    Vicki testified that in February 2007, she called Aaron because the child support payments were too difficult for her to pay. Aaron told her that he would not take money from

her if she signed adoption papers; this was the first time she had heard about adoption. Aaron again mentioned adoption around Christmastime in 2008. At the end of 2009, Aaron again mentioned adoption and suggested Vicki speak to an attorney, which she did.

¶ 114    Vicki testified that she called the child's school to obtain information about him beginning in 2007; she did not know what school he attended, so she called all of the schools in the area, and when she discovered the correct school, she requested to speak with the child's teacher. She was permitted to speak with his teacher once, when the child was in first grade. She also testified that Aaron contacted her once in 2008 to inform her that the child had broken his arm but did not call her about any other medical issues.

¶ 115    Vicki testified that after CASA had suspended her visitation, she attempted to locate other individuals who would be willing to supervise visitation; she filed documents with the court with suggestions, but Aaron's attorney objected to each individual and her requests were denied.

¶ 116    Vicki testified that her VA disability compensation ruling, entered on November 14, 2000, found that she was 50% disabled due to major depressive disorder. She later had a second suicide attempt that resulted in her disability rating increasing to 70% disabled.

¶ 117    Vicki testified that she recently moved and did not recall her address, but lived in California. Vicki acknowledged putting the child's photograph and using his name on the Internet, but denied creating a Facebook or Myspace page for him; she testified that she removed the postings from the Internet. She denied posting many of the things on the Internet and testified that some of them may have been placed by her mother; she also denied the accuracy of some of the printouts shown as exhibits. Vicki identified a number of photographs of herself in various poses.

¶ 118    Vicki also testified to a number of traffic citations, court cases, and lease disputes. She further testified that on several occasions, she and Joel had contact with the police in connection with complaints of domestic violence; Vicki denied that the child was ever present during the domestic disputes. Vicki testified that she had been raped three times by three different men; she also testified that she was sexually assaulted as a child.

¶ 119    Vicki also testified about Windecker. A close friend recommended him as an investigator in her case, and she met with him several times. She was not aware of Windecker's background when she asked him to investigate for her. Vicki testified that she asked him to investigate Aaron's businesses and his criminal background. She gave him Aaron's phone number and address, but did not ask him to do anything harmful; she testified that he was coming to Illinois mostly to interview people and look at paperwork.

¶ 120                                    D. Expert Testimony
¶ 121                                        1. Dr. Edger
¶ 122    The GAL called one witness, Dr. Robert Edger, a board-certified psychiatrist who performed an evaluation of Vicki at the court's request in July 2010. Dr. Edger testified that when he evaluated Vicki, one of the items he evaluated her for was ADD, as well as for any other mental health issues. Dr. Edger testified that he reviewed Vicki's medical records,

interviewed her for approximately two hours, and had Vicki complete several questionnaires to assist in screening for depression and ADD.

¶ 123     Dr. Edger testified that Vicki was "very dramatic" during the interview. When she came in, she wished to videotape the session, but Dr. Edger did not want to use their session time to set up a video recording; he testified that there was no advance notice that she would desire the session to be videotaped. Dr. Edger testified that "her reaction was remarkable and I outlined this in my report and then she was very paranoid about this, feeling that I *** would basically be against her." Dr. Edger testified that he had never had anyone request to be videotaped in his 30 years of practice and that it was "significantly unusual."

¶ 124     Dr. Edger testified that in reviewing Vicki's medical records, there was never a diagnosis of ADD, but what was "striking" was that, over a 10-year period, she was repeatedly diagnosed with major depression, rule out bipolar disorder, anxiety, borderline personality, and paranoia. He also testified that there were very few treatment notes in her records, indicating that she had not been treated for her mental health issues.

¶ 125     Dr. Edger testified that there was a note of a past suicide attempt in 1999, where Vicki was found on the side of the road at an Air Force base, having ingested tricyclic antidepressants; Dr. Edger testified that he requested the records of her inpatient care from Vicki's attorney, but never received them. There was another report of "suicidal acting out" in 2000 or 2001.

¶ 126     Dr. Edger testified that while he was interviewing Vicki, she wept, which was not unusual, but was indicative of mood lability, which is a symptom of a mood disorder such as depression or bipolar disorder.

¶ 127     Dr. Edger testified that he reviewed Dr. Nicholos' report, which he found to be very comprehensive and accurate. Dr. Edger testified that he was "struck" by "examples of extremes" in Dr. Nicholos' report; he pointed to the occasion of shaving the child's head because of gum stuck in his hair.

¶ 128     In reviewing Vicki's records and based on his interview with her, Dr. Edger testified that his diagnosis of Vicki would be "Bipolar II," which was characterized by chronic recurrent depressions punctuated by hypomanias. He opined that to treat her illness, Vicki would need psychotherapy, a prescription for a mood stabilizer, and to stop any marijuana or amphetamine consumption. He further opined that it would be very difficult for Vicki to bring her behavior into line with norms in such a way that she could be an effective parent and that her judgment and self-control were sufficiently impaired that parenting would be difficult or impossible.

¶ 129     The GAL later recalled Dr. Edger, who testified that since the last time he was in court, he was able to review Dr. O'Connell's report, which referred to a conversation with Vicki's father. The GAL asked Dr. Edger to contact Vicki's father and follow up on that information, which Dr. Edger did. Dr. Edger testified that the information he received from Vicki's father solidified his previous opinion.

¶ 130                                    2. Dr. O'Connell

¶ 131        Dr. Linda O'Connell, a clinical psychologist with a specialty in child psychology who previously worked at DCFS, testified on Vicki's behalf. Dr. O'Connell testified that she evaluated Vicki's mental health and her ability to parent. She interviewed Vicki for seven hours, and also interviewed Vicki's parents and maternal grandparents, and her treating physician at the VA. She also reviewed two reports, one completed by Dr. Edger and one completed by Dr. Nicholos; she did not look at the reports until after she had interviewed Vicki and formed her initial impressions. She also reviewed Vicki's medical records and requested any documentation that was relevant to parenting and Vicki, including court orders and transcripts. Finally, Dr. O'Connell also administered several psychological tests.

¶ 132        Dr. O'Connell testified that her initial observations of Vicki were that she seemed disorganized, "somewhat tangential," unfocused, and hyperverbal, but that she was cooperative, forthcoming, and willing to answer questions, although she sometimes had trouble knowing what was important and would elaborate on unimportant matters. Dr. O'Connell found her of average or better intelligence. Dr. O'Connell further testified that she observed that Vicki did not make good judgments in interpersonal matters.

¶ 133        Dr. O'Connell testified that Vicki had a number of different diagnoses at the VA, including depression, ADD, posttraumatic stress syndrome, and personality disorders. Dr. O'Connell concluded from the records that Vicki had consistently presented the same array of symptoms–a high level of anxiety, poor interpersonal coping skills, depression, and chronic trouble focusing–but some of the symptoms would be more prominent at times than others, resulting in different diagnostic labels.

¶ 134        Dr. O'Connell testified that as part of the documents she reviewed, she read a letter from Dr. Helfrich, the psychiatrist who had treated Vicki from 2009 until the summer of 2011. Dr. O'Connell testified that Dr. Helfrich's letter stated that Vicki had a history of bipolar disorder and depression, but that she was not being responsive to medication. He concluded that her symptoms fit those of ADD and prescribed her Ritalin, which contained an amphetamine, and then prescribed her dextroamphetamine; his letter further stated that Vicki was compliant with her medication, that she never asked for it to be refilled ahead of time, and that he thought it was somewhat helpful for her.

¶ 135        Dr. O'Connell testified that Vicki's "condition" was treatable, predominantly through psychotherapy. She further testified that Vicki's current psychiatrist, whom Vicki began seeing in October 2011, arranged a 12-week dialectical behavior therapy course that Vicki completed, and placed her on the waiting list for individual therapy.

¶ 136        Dr. O'Connell testified that she did not investigate drug abuse other than looking through Vicki's VA records, where her doctors did not mention it. She was aware that Vicki had a license for medical marijuana and did not believe that Vicki's use of marijuana was an abuse of it, since it was her understanding that Vicki had done her best to discontinue use of it except in the case of severe migraines.

¶ 137        Dr. O'Connell testified that Vicki has been very responsive to support and that, when treated in a supportive manner, Vicki relaxes and "can attend to things and tries to improve what she is doing." She further testified that Vicki had a "sustained and continuing interest"

in the child and that "[Vicki's] child was the center of her life for the first two and a half years starting with the pregnancy. She appears to have done everything for him. She appears to love him very much and be very concerned with his well-being. She has made attempts to continue to see him but she has not been able to but she very clearly is very attached and has a bond and loves her child." Dr. O'Connell concluded that Vicki "tried to do everything that she could to be responsible to her son, to stay in touch with him and to be a part of his life."

¶ 138    Dr. O'Connell testified that she was aware that Vicki was an exotic dancer, and Vicki's parents told her that Vicki began dancing in order to earn enough money to pursue her visits with her child and to cover her legal fees.

¶ 139    Dr. O'Connell further testified that she discussed Vicki's criminal background with her. She testified that Vicki explained that she had an assault charge in 2002, which Vicki believed was resolved through plea bargain but which "reemerged" two or three years later; while there were other small violations such as driving without a seatbelt, the assault charge was the "major one" Dr. O'Connell was aware of.

¶ 140    Dr. O'Connell was aware that Vicki had attempted suicide when she was 20 and was aware of a psychiatric hospitalization for a suicide attempt while Vicki was in the Army. Dr. O'Connell testified that she did not have any concern about Vicki being suicidal now. She also saw no evidence that Vicki would harm someone in any significant way. Dr. O'Connell opined that none of the issues she observed made Vicki an unfit parent or affected her ability to have contact with her child or her capacity to meet basic emotional and physical needs of the child.

¶ 141    On cross-examination, Dr. O'Connell admitted that she was unaware of the blogs and pictures available on the Internet, and agreed that photographs such as ones with Vicki holding her hand on her crotch were "poor judgment."

¶ 142                          E. Other Witnesses
¶ 143                             1. Dr. Baker
¶ 144    Dr. Stephanie Baker, the child's pediatrician since July 11, 2005, testified on behalf of Aaron and Jennifer. Dr. Baker testified that on July 11, 2005, the child had an appointment for a physical exam, which she performed. From the exam, Dr. Baker concluded that the child was a two-year-old with some language delays; he was only able to say seven words, so she told Aaron to work with the child and if he was not improving, to see a speech therapist. She also noticed that he had multiple cavities, so she recommended a dentist; the dentist reported back to Dr. Baker that the child had extensive decay on 9 of his 20 primary teeth. Finally, she observed several splinters in the child's toes and feet. Dr. Baker testified that generally, the child was in good health.

¶ 145    Dr. Baker testified that in November 2005, Vicki informed Dr. Baker's colleague that the child was "photosensitive," but Dr. Baker did not believe that he was. There was also a question of whether the child had multiple food allergies, but he did not have any. Dr. Baker further testified that Aaron had reported that the child had not been previously vaccinated, so the child was vaccinated in 2006. She also testified that Vicki began prenatal care at 27½

weeks.

¶ 146 Dr. Baker testified that the allergist that the child was sent to questioned whether the child had asthma based on an episode of bronchospasm during general anesthesia while at the dentist, so the allergist X-rayed the child and believed that he had enlarged adenoids and referred the child to an ear, nose, and throat doctor. The child was evaluated by the ear, nose, and throat doctor, who recommended removing the child's adenoids and inserting ear tubes; Dr. Baker testified that neither of these procedures is uncommon in children. Based on her dealings with the child over the years, Dr. Baker opined that the child was in very good health and that his asthma was under control.

¶ 147 On cross-examination, Dr. Baker testified that at the initial exam, Aaron asked her to perform a drug test on the child; there were no drugs found in the child's system.

¶ 148                                     2. Christina Schneider

¶ 149 Christina Schneider, special assistant general counsel for DCFS, testified on Aaron and Jennifer's behalf. Schneider reviewed the letter sent to Aaron from DCFS, and she testified that it was unusual for a DCFS investigator to report that something was a "blatantly false report" and unusual that an investigator would say in that type of letter that "it clearly appears to me that the harassment of you and [the child] is significantly increasing." Schneider further testified that it was unusual for an investigator to say in a letter, "anyone who has such a history of making probable intentionally false reports cannot have the best interest and the welfare of your son *** in mind, because of the pattern described above it is necessary for you to continue to take all possible steps to protect [the child] and yourself from similar harassment in the future." She testified that it was unusual because the letter contained much stronger language than would normally appear in such a letter.

¶ 150                                     3. Denise Patton

¶ 151 Aaron and Jennifer's next witness was Denise Patton, a private adoption attorney who was approached by Aaron and Jennifer in October 2009 to adopt the child. She testified that the adoption was to be uncontested. Patton contacted Vicki's attorney to discuss Vicki signing the consent form, but once she discovered that Vicki was receiving disability income from the VA, she contacted the attorney to discuss whether there was a mental health condition; Patton was concerned about the validity of a consent form signed by a person with a mental health condition. The attorney never sent Patton a letter from a physician to rule out a mental health condition, as requested, but contacted Patton to inform her that Vicki was changing attorneys.

¶ 152 Patton testified that Vicki's new attorney contacted Patton and told her that Vicki stated that if she needed to see a psychologist for a letter, she also wanted Jennifer to see a psychologist and have a letter stating that she was a good parent and had a good relationship with the child; Jennifer complied, and the letter was sent to Vicki and her attorney in November 2009.

¶ 153 Patton testified that in December 2009, she and Vicki's attorney began negotiations

around the issue of Vicki signing the consent. Vicki made several demands, including waiver of any child support obligations. Patton informed Vicki and her attorney that it would be very inappropriate to make such an agreement and that it would not be permitted under Illinois law. However, they agreed to include a clause that stated that if it was permitted under Colorado law, Aaron would waive any collection of arrearage of support payment. Patton testified that Vicki's attorney emailed her and stated that Vicki had signed the consent in his presence. Patton never received the consent because the attorney told her that they would not release it until Aaron demonstrated in good faith that he would stop the pursuit of arrearages; the same day, Aaron emailed someone in Colorado to ask them to stop collection of arrearages.

¶ 154    Patton conveyed that information to Vicki's attorney, who told Patton that Vicki had the consent form and would not give it to him. Vicki had instructed him to inform her when the arrearages had been stopped and she would mail it to Aaron, her attorney, or Patton. Patton testified that she never received the consent and understood from Vicki's attorney that Vicki "left" and stopped returning the attorney's calls. When Vicki did not send the consent form, Aaron again contacted the Colorado authorities to have the arrearages reinstated.

¶ 155    Patton testified that she filed a petition to adopt, still treating it as an uncontested matter, and served it on Vicki, although it was difficult to locate Vicki because she would not cooperate. Once it became clear that the adoption would be contested, Patton did not believe she was the appropriate attorney to handle the matter and referred Aaron and Jennifer to a different attorney.

¶ 156                                    4. Betty

¶ 157    Betty D., Aaron's mother, also testified on behalf of Aaron and Jennifer. Betty testified that Vicki called her in 2002 and informed Betty that she was considering having an abortion and needed some funds. Betty testified that she first met the child in Missouri when he was three months old; she, Aaron, and Jennifer met Vicki, Vicki's grandparents, and the child in a Burger King parking lot. Vicki immediately asked for money; she had required them to bring a check in order to be able to visit with the child. Betty was annoyed and told Vicki that she was not going to hand out money in the parking lot; they went inside the restaurant and sat down. After some time, Vicki again asked for the money and was unhappy when Betty had a check and not cash. Vicki's grandfather took Betty to the bank and they cashed the check.

¶ 158    Betty testified that she visited with the child on Memorial Day weekend in 2005. Aaron had provided Vicki with a hotel room, and Betty and her husband went to the hotel to pick up Vicki and the child and take them to dinner. After dinner, Betty took Vicki and the child to Betty's home, where they talked for several hours. Betty testified that Vicki told her that she had conflicts with her husband, including domestic violence, and that the police had taken her to a women's shelter. Vicki was asked to leave the shelter because of a conflict with the people who ran the shelter. Vicki told Betty that she called her mother and made arrangements to stay at a hotel; her grandmother, her mother, and her aunt were to pick her up from the shelter. Vicki told Betty that she did not stay at the hotel because there was a

fight in the hotel room; Vicki thought her aunt was stealing her money, and there was a physical altercation. Betty testified that Vicki informed her that the child was present during the altercation.

¶ 159    Betty testified that during that same conversation, Vicki informed her that she was on disability income and that if she had a job, she would lose her disability income. Vicki told Betty that the reason for her disability was that she was raped by two people in the Army.

¶ 160    Betty testified that the next time she saw Vicki was the next day. Vicki called her and asked her to come to the hotel because there were police outside her door. Betty went to the hotel and there were two officers from the Cook County sheriff's department at her door. They told Betty that they were there to deliver some papers to Vicki. Vicki would not open the door and seemed very upset, and Betty told the officers that she was concerned about the child because she did not hear any noise coming from inside the room. After speaking to someone on their walkie-talkies, the officers told Vicki that if she did not open the door immediately, they would call the police department and have them come and take the door down at her expense. Vicki opened the door and the officers gave her the paperwork; Betty testified that Vicki "read the paperwork and in a matter of moments she became hysterical." Betty testified that Vicki was "very, very angry" and immediately informed the officers that Aaron had come in and beaten her, hitting her in the head, arms, and legs. Vicki told the officers that she had a friend who could be a witness, but was unable to provide the friend's name.

¶ 161    Betty testified that she stayed with Vicki for a while because Vicki was upset, and then picked up the child seat she had lent Vicki the night before and began to leave. Vicki insisted that the child seat was hers and called the police department to report that Betty was stealing her child seat. The police contacted Betty and she told them the child seat was hers, offering to provide a receipt for it if necessary.

¶ 162    Betty testified that she went to Colorado to pick up the child in July 2005 after Vicki's brother contacted them. After they retrieved the child, they drove back to Illinois, stopping at a hotel overnight. At the hotel, Betty noticed that the child had slivers all over his feet. Shortly after they returned, Betty was with her husband and child playing in the backyard when someone from DCFS arrived and examined the child's feet.

¶ 163    Betty testified that once in November 2003, she and her husband were going to Hawaii and had a layover in San Francisco, so they contacted Vicki to determine if they would be able to visit the child. Vicki agreed, saying that she would bring the child to the airport, but prior to the visit, Vicki informed Betty that they could only visit with the child if they sent a check for $700 to have Vicki's vehicle repaired. Betty did not have the money, so they were unable to visit the child; Betty was upset about it.

¶ 164                                                      5. GAL

¶ 165    The GAL also testified on behalf of Aaron and Jennifer. She testified that while she does not usually participate in the fitness portion of adoption proceedings, she did in this case because of the presence of the child's name on the Internet. She investigated both Vicki and Aaron and Jennifer, since Vicki's counsel had also raised the issue of Aaron and Jennifer's

fitness. The GAL testified that at some point, someone had mentioned searching for the child's name on Google, so she did so herself and discovered a number of photographs and blogs that she believed were inappropriate, including claims that the child was the result of a rape and that he was not wanted.

¶ 166     The GAL testified that through her Internet research, she discovered that Vicki had made inquiries about how to remove the items from the Internet, but that the first time she did so was two weeks before trial.

¶ 167                                   6. Leita

¶ 168     Leita P., Vicki's grandmother, testified on Vicki's behalf. She testified that when the child was still a baby, Vicki came to Missouri with him to visit. They also visited with Aaron, Jennifer, and Betty, meeting them at a Burger King near their hotel; Vicki, Leita's husband, and the child were also present at the Burger King. Leita testified that Vicki did not yell at anyone at the Burger King or ask for money, but Leita's husband did ask for money; Leita testified that her husband was slightly rude when asking for the money.

¶ 169                                   7. Donna

¶ 170     Donna L., Vicki's mother, also testified on Vicki's behalf. She testified that one evening in August 2002, Vicki called her, upset, and asked Donna to pick her up. Donna picked Vicki up from a hospital in Colorado Springs; Vicki was hysterical and was crying on the way home. Vicki told Donna and Donna's boyfriend that Aaron had raped her. The next morning, Donna and her boyfriend went to the OTC to see Aaron, but they were not permitted to enter by the guard. Vicki discovered that she was pregnant and was given prenatal vitamins. Donna testified that they did not report the rape to the police.

¶ 171     Donna testified that she created a Myspace page for the child, but removed it as soon as Vicki's attorney told her to.

¶ 172                                   8. Sunday

¶ 173     Vicki also called Sunday C., a friend, to testify on her behalf. Sunday testified that she was present when the child was born. She testified that Vicki was a wonderful mother.

¶ 174                              F. Trial Court Ruling

¶ 175     On April 26, 2012, the trial court read its 25-page ruling, finding that Vicki was unfit on the basis of depravity and failure to maintain contact with the child. The court first recounted the proceedings on the case and the parties' testimony. The court then recited the standard for finding Vicki unfit and recounted the information it relied on in making its decision. The court read extensively from Vicki's Internet posts on blogs, Myspace, and Facebook, which the court found were important in making its decision. The court noted that Vicki was an exotic dancer, which was not illegal, but found that her photographs on the Internet were "disturbing," because they depicted "[Vicki's] interest in bondage. Photographs with her hanging from chains with her wrist cuffed. Pictures skimpily dressed; pictures with her hand

-27-

at her genitals, very, very suggestive photographs. All of these were found on the Internet by the GAL, all by Googling [the child's] name. This is particularly disturbing."

¶ 176    The court next discussed Vicki's involvement with the police, beginning with "domestic disputes; violence with Joel ***, her husband; arguments with landlords; arguments with roommates; arguments with doctors at the VA Hospital; arguments at the school she attended; arguments with Aaron; arguments with Betty ***. Everywhere Vicki goes, life is chaos." The court also discussed Vicki's demeanor in court, noting that "she was late because they had a flat. She was late because they got stopped for a ticket. She missed the first court date because she claimed she didn't know that she had the court date, and then she appeared a week later on a default hearing which I vacated." The court further pointed out that "[h]er behavior in court even when she knew she was being observed was petulant; sometimes uncooperative; sometimes she had a bored affect. There were several times when I noted that she sat and examined her manicure while on the stand, yawned, sighed, and stretched loudly on and off the stand. There were accusations that she made faces at the other participants, although I did not see them. Even though she knew she was being watched, and under high scrutiny in court, her behavior was inappropriate, or minimally appropriate."

¶ 177    The court also found Vicki's testimony incredible: "Her credibility was lacking significantly. Throughout the trial everything that happened was not her fault. She had an excuse for everything. Someone hacked into her Facebook account. She didn't send the emails. Oddly, she couldn't recall her own address, even though she rattled off almost every address ever asked of her. She was evasive at times, and simply lacking in any credibility." The trial court again discussed Vicki's occupation as an exotic dancer and Vicki's fears about using her own name because she did not want her customers to know where she was. The trial court further agreed with Dr. Edger's conclusion that Vicki was bipolar and incapable of conforming her behavior to a moral standard that is acceptable.

¶ 178    The trial court concluded by again referring to Vicki's blog postings:

"The thought that a child could go on online and see what is on these blogs on the Internet is just incomprehensible to me. The thought that his friends could see any of these things. There was one entry which I think I neglected to read that indicated that [Vicki] said she had thought she wouldn't tell [the child] about the rape until he was older, indicating that, perhaps, she had told him about the rape. I certainly hope that's not the case. Given the lack of credibility, I don't believe that it was a rape. I believe it was consensual sex, and I believe that the behavior exhibited throughout the ensuing years has shown a lack of ability to conform to a moral standard[ ] which is acceptable and, thus, that [Vicki] reaches the definition of depravity."

¶ 179    The court also found Vicki unfit on the basis of failing to maintain reasonable contact with the child. The court noted that Vicki "knows her way around the court system." The court noted that Vicki had supervised visits and phone visitation, but that they always ended due to Vicki's conduct. Once the visits were terminated, Vicki accepted the result, choosing not to proceed through the court system to reinstate contact.

¶ 180    The court noted that Vicki traveled around the country to dance but never chose to work in Illinois; "[t]hroughout this time she could have come here; worked here; established some

relationship with her son, but she did not." The court found Dr. Edger's report to be credible and supported by Vicki's actions in court and by her testimony, as well as by the evidence submitted at trial. The court found:

> "It is hereby the finding of this Court that Vicki *** is found to be unfit on the bases of depravity and failure to maintain contact. In so saying, I am not saying that she doesn't want to be a good parent. I think she does; however, the evidence is overwhelming that she is not able to be so, and that she is simply incapable of conforming to societal norms."

The court ordered Vicki's rights terminated and by request of the parties, immediately proceeded to the best interest hearing.

¶ 181    On the same day, the trial court entered an order finding that the adoption of the child by Aaron and Jennifer was in the child's best interest, and on April 30, 2012, the court entered a judgment order for adoption. In the judgment order for adoption, the court found that Vicki was an unfit parent in that she was depraved and failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare, which had been determined following a trial on the issue of fitness. The court further found that the child had resided with Aaron and Jennifer for seven years and that Aaron and Jennifer had continued to co-parent the child cooperatively since their divorce in 2011, and entered the judgment order of adoption. The instant appeal follows.

¶ 182                                ANALYSIS

¶ 183    On appeal, Vicki argues that the trial court's decision that she was unfit was not supported by clear and convincing evidence. Vicki also makes several arguments concerning the fairness of her trial, none of which are supported with case law and some of which are raised for the first time on appeal, so we do not consider them. However, prior to addressing the merits of Vicki's claim, we consider an argument she makes concerning Aaron and Jennifer's standing to file an adoption petition.

¶ 184                     I. Validity of Adoption Petition

¶ 185    Vicki argues that since Aaron and Jennifer are no longer adopting as a married couple but as unmarried individuals, they are not statutorily permitted to adopt. To determine whether Aaron and Jennifer have standing to file an adoption petition, we examine the statute. Since the construction of a statute is a question of law, we review it *de novo*. *J.S.A. v. M.H.*, 224 Ill. 2d 182, 196 (2007). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 186    The Adoption Act (the Act) (750 ILCS 50/0.01 *et seq.* (West 2008)) sets forth who may adopt a child:

> "A reputable person of legal age and of either sex, provided that if such person is married and has not been living separate and apart from his or her spouse for 12 months or longer, his or her spouse shall be a party to the adoption proceeding, including a husband

-29-

or wife desiring to adopt a child of the other spouse, in all of which cases the adoption shall be by both spouses jointly[.]" 750 ILCS 50/2(A)(a) (West 2008).

The Act additionally defines a "related child" as "a child subject to adoption where either or both of the adopting parents stands in any of the following relationships to the child by blood or marriage: parent, grand-parent, brother, sister, step-parent, step-grandparent, step-brother, step-sister, uncle, aunt, great-uncle, great-aunt, or cousin of first degree." 750 ILCS 50/1(B) (West 2008).

¶ 187    The Act also provides several instructions concerning construction of the Act. First, the Act provides that "this Act shall be liberally construed, and the rule that statutes in derogation of the common law must be strictly construed shall not apply to this Act" (750 ILCS 50/20 (West 2008)), and further instructs that "[t]he best interests and welfare of the person to be adopted shall be of paramount consideration in the construction and interpretation of this Act" (750 ILCS 50/20a (West 2008)). Finally, the Act states that "[t]he singular includes the plural and the plural includes the singular and the 'male' includes the 'female', as the context of this Act may require." 750 ILCS 50/1(G) (West 2008).

¶ 188    In the case at bar, Vicki argues that Aaron and Jennifer did not have standing to file a petition to adopt the child because they were two unmarried individuals and not a married couple. We do not find this argument persuasive. While Vicki claims that this issue is one of first impression, we agree with Aaron and Jennifer that the 1995 appellate case of *In re Petition of K.M.*, 274 Ill. App. 3d 189 (1995), permits them to file their petition as unmarried persons.

¶ 189    In *K.M.*, the appellate court considered whether same-sex individuals had standing to file an adoption petition. The court considered two cases, both involving lesbian couples. In the first case, one of the petitioners was the natural mother of the child; in the other, one of the petitioners was the natural mother of one of the children sought to be adopted and the adoptive mother of the other. Thus, in each case, one of the petitioners was already the legal mother of the child sought to be adopted.

¶ 190    In determining whether the Act should be interpreted to permit unmarried individuals to jointly adopt, the *K.M.* court noted that the Act was to be liberally construed and expressly provides for plural construction to be given to singular terms. *K.M.*, 274 Ill. App. 3d at 194, 195. The court also found the Act's definition of "related child" to be significant:

"The definition of a 'related child' cited above contemplates a situation in which only one–'either'–of the adopting parents is related to the child 'by blood *or marriage*.' If only one of the adopting parents is related by blood or marriage, the second adopting parent clearly need not be so related. If, however, *** only married couples can adopt, then *both* adopting parents will *always* be related to the child by blood or marriage. Such an interpretation would render meaningless the statute's use of the term 'either' in section 1(B). [Citation.] The fact that the statute provides that 'either' adopting parent may be related to the child by blood or marriage necessarily implies that unmarried couples can adopt; this is the only reading of the statute that makes the use of the term 'either' meaningful." (Emphases in original.) *K.M.*, 274 Ill. App. 3d at 198 (quoting 750 ILCS 50/1(B) (West 1994)).

¶ 191    The court concluded that "[l]iberal construction of the language of the Act *** would allow adoption by two persons where *either* or *both* stands in *any* of the listed relationships to the child," including the situation where the petition for adoption is filed by one parent of the child and that parent's unmarried partner. (Emphases in original.) *K.M.*, 274 Ill. App. 3d at 198. The court further pointed out that the "related child" provision had been used several times to determine that certain classes of people were able to adopt. *K.M.*, 274 Ill. App. 3d at 200 (citing *In re Adoption of Ruiz*, 164 Ill. App. 3d 1036 (1987) (grandparents could adopt), and *Madsen v. Chasten*, 7 Ill. App. 3d 21 (1972) (older adults could adopt, because the Act contemplates people of grandparent age as able to adopt)).

¶ 192    Finally, the court noted that sufficient safeguards were in place to prevent any abuses of the Act:

> "While it must be acknowledged, as the circuit court fears, that such an interpretation of the Act would in fact give standing to petition to any group considering itself a family where one or more of the members of the group were related to the child or children to be adopted, the circuit court retains the safeguard of evaluating whether the granting of such a petition would be in the best interests of the child or children. Such a safeguard will prevent adoption of any child by a 'cult group' where such adoption would not be in the child's best interests." *K.M.*, 274 Ill. App. 3d at 201.

¶ 193    In the case at bar, we agree with Aaron and Jennifer that *K.M.* clearly supports their ability to jointly petition to adopt the child. There is no question that Aaron is related to the child by blood, so the situation here is essentially identical to that presented in *K.M.*: one petitioner is the child's natural parent and the other is not, but the two seek to jointly adopt the child. We are not persuaded by Vicki's distinction that in *K.M.*, "the petitioners presumably lived together and maintained an intimate relationship supportive of the best interests of the minor child." The *K.M.* court did not reach its conclusion based on the fact that the petitioners were currently living together; the court specifically noted that the statutory language contemplated unmarried people adopting and that the consideration of the child's best interest would prevent any abuses. In the case at bar, in granting the petition to adopt, the court found that it was in the best interest of the child to permit Aaron and Jennifer to adopt him. Thus, we cannot find that Aaron and Jennifer lacked standing to file an adoption petition and proceed to consider the merits of Vicki's argument.

¶ 194                              II. Determination of Unfitness

¶ 195    Vicki argues that the trial court's finding that she was unfit was not supported by clear and convincing evidence. In reviewing an adoption petition that alleges one parent is unfit, the trial court must first determine whether the parent is unfit. *In re Adoption of G.L.G.*, 307 Ill. App. 3d 953, 963 (1999). If the parent is found unfit, the court then considers whether the adoption is in the child's best interest. *G.L.G.*, 307 Ill. App. 3d at 963. In the case at bar, Vicki's sole focus is the trial court's finding of unfitness, so we limit our review to that issue and do not discuss whether the adoption is in the child's best interest.

¶ 196    Parental unfitness must be proven by clear and convincing evidence. *In re Adoption of Syck*, 138 Ill. 2d 255, 273-74 (1990). The burden of proving unfitness is upon those who

have petitioned for adoption of the child. *Syck*, 138 Ill. 2d at 274. Since the trial court was in the best position to view and evaluate the parties, its decision is entitled to great deference, and a finding of unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re Brown*, 86 Ill. 2d 147, 152 (1981). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005).

¶ 197    In the case at bar, the trial court found that Vicki was unfit under both sections 1(D)(i) and (b) of the Adoption Act. Since the grounds for unfitness are independent, evidence supporting any one of the alleged statutory grounds is sufficient to uphold a finding of unfitness. *In re E.O.*, 311 Ill. App. 3d 720, 726 (2000); *In re T.Y.*, 334 Ill. App. 3d 894, 905 (2002); *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000); see also *In re D.L.*, 191 Ill. 2d 1, 8 (2000) (section 1(D) lists a variety of discrete grounds for finding a parent unfit and a challenge of only one ground of unfitness among several renders the appeal moot). Accordingly, unless the trial court's finding of unfitness under *both* sections 1(D)(i) and (b) were against the manifest weight of the evidence, we must affirm the court's decision regarding fitness.

¶ 198                                      A. Depravity

¶ 199    The trial court first found that Vicki was unfit under section 1(D)(i), which provides:

"(i) Depravity. Conviction of any one of the following crimes shall create a presumption that a parent is depraved which can be overcome only by clear and convincing evidence: (1) first degree murder in violation of paragraph 1 or 2 of subsection (a) of Section 9-1 of the Criminal Code of 1961 [(720 ILCS 5/9-1 (West 2008))] or conviction of second degree murder in violation of subsection (a) of Section 9-2 of the Criminal Code of 1961 of a parent of the child to be adopted; (2) first degree murder or second degree murder of any child in violation of the Criminal Code of 1961; (3) attempt or conspiracy to commit first degree murder or second degree murder of any child in violation of the Criminal Code of 1961; (4) solicitation to commit murder of any child, solicitation to commit murder of any child for hire, or solicitation to commit second degree murder of any child in violation of the Criminal Code of 1961; (5) predatory criminal sexual assault of a child in violation of Section 11-1.40 or 12-14.1 of the Criminal Code of 1961; (6) heinous battery of any child in violation of the Criminal Code of 1961; or (7) aggravated battery of a child in violation of the Criminal Code of 1961.

There is a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies under the laws of this State or any other state, or under federal law, or the criminal laws of any United States territory; and at least one of those convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights.

There is a rebuttable presumption that a parent is depraved if that parent has been criminally convicted of either first or second degree murder of any person as defined in the Criminal Code of 1961 within 10 years of the filing date of the petition or motion to

terminate parental rights.

No conviction or finding of delinquency pursuant to Article 5 of the Juvenile Court Act of 1987 shall be considered a criminal conviction for the purpose of applying any presumption under this item (i)." 750 ILCS 50/1(D)(i) (West 2008).

¶ 200    The Act does not define depravity, but the Illinois Supreme Court has held that depravity consists of "an inherent deficiency of moral sense and rectitude." (Internal quotation marks omitted.) *In re Donald A.G.*, 221 Ill. 2d 234, 240-41 (2006); *In re Abdullah*, 85 Ill. 2d 300, 305 (1981); *Stalder v. Stone*, 412 Ill. 488, 498 (1952). " 'Depravity may be shown by a series of acts or a course of conduct which indicates a deficiency in a moral sense and shows either an inability or an unwillingness to conform to accepted morality.' " *In re Adoption of Baby Girl Casale*, 266 Ill. App. 3d 656, 663 (1994) (quoting *In re M.B.C.*, 125 Ill. App. 3d 512, 514 (1984)); *In re Marriage of T.H.*, 255 Ill. App. 3d 247, 255 (1993). In order to establish unfitness, "clear and convincing evidence of depravity must be shown to exist at the time of the petition, and the 'acts constituting depravity *** must be of sufficient duration and of sufficient repetition to establish a 'deficiency' in moral sense and either an inability or an unwillingness to conform to accepted morality.' " *In re J.A.*, 316 Ill. App. 3d 553, 561 (2000) (quoting *In re Adoption of Kleba*, 37 Ill. App. 3d 163, 166 (1976)).

¶ 201    In determining depravity, the trier of fact is required to closely scrutinize the character and credibility of the parent, and the reviewing court should give deferential treatment to the determination of the trier of fact. *J.A.*, 316 Ill. App. 3d at 563 (citing *In re A.L.*, 301 Ill. App. 3d 198, 202 (1998)). Because each case involving parental unfitness is *sui generis*, courts do not make factual comparisons to other cases. *In re J'America B.*, 346 Ill. App. 3d 1034, 1046 (2004) (citing *J.A.*, 316 Ill. App. 3d at 561).

¶ 202    In the case at bar, the trial court found that Vicki was depraved for a number of reasons. The court first read extensively from Vicki's Internet posts on blogs, Myspace, and Facebook, which the court found were important in making its decision. The court noted that Vicki was an exotic dancer, which was not illegal, but found that her photographs on the Internet were "disturbing," because they depicted "[Vicki's] interest in bondage. Photographs with her hanging from chains with her wrist cuffed. Pictures skimpily dressed; pictures with her hand at her genitals, very, very suggestive photographs. All of these were found on the Internet by the GAL, all by Googling [the child's] name. This is particularly disturbing."

¶ 203    The court next discussed Vicki's involvement with the police, beginning with "domestic disputes; violence with Joel ***, her husband; arguments with landlords; arguments with roommates; arguments with doctors at the VA Hospital; arguments at the school she attended; arguments with Aaron; arguments with Betty ***. Everywhere Vicki goes, life is chaos." The court also discussed Vicki's demeanor in court, noting that "she was late because they had a flat. She was late because they got stopped for a ticket. She missed the first court date because she claimed she didn't know that she had the court date, and then she appeared a week later on a default hearing which I vacated." The court further pointed out that "[h]er behavior in court even when she knew she was being observed was petulant; sometimes uncooperative; sometimes she had a bored affect. There were several times when I noted that she sat and examined her manicure while on the stand, yawned, signed, and

stretched loudly on and off the stand. There were accusations that she made faces at the other participants, although I did not see them. Even though she knew she was being watched, and under high scrutiny in court, her behavior was inappropriate, or minimally appropriate."

¶ 204    The court also found Vicki's testimony incredible: "Her credibility was lacking significantly. Throughout the trial everything that happened was not her fault. She had an excuse for everything. Someone hacked into her Facebook account. She didn't send the emails. Oddly, she couldn't recall her own address, even though she rattled off almost every address ever asked of her. She was evasive at times, and simply lacking in any credibility." The trial court again discussed Vicki's occupation as an exotic dancer and Vicki's fears about using her own name because she did not want her customers to know where she was. The trial court further agreed with Dr. Edger's conclusion that Vicki was bipolar and incapable of conforming her behavior to a moral standard that is acceptable.

¶ 205    The trial court concluded by again referring to Vicki's blog postings:

"The thought that a child could go on online and see what is on these blogs on the Internet is just incomprehensible to me. The thought that his friends could see any of these things. There was one entry which I think I neglected to read that indicated that [Vicki] said she had thought she wouldn't tell [the child] about the rape until he was older, indicating that, perhaps, she had told him about the rape. I certainly hope that's not the case. Given the lack of credibility, I don't believe that it was a rape. I believe it was consensual sex, and I believe that the behavior exhibited throughout the ensuing years has shown a lack of ability to conform to a moral standard[ ] which is acceptable and, thus, that [Vicki] reaches the definition of depravity."

¶ 206    We cannot find the trial court's decision that Vicki was depraved is against the manifest weight of the evidence. The trial court explained thoroughly everything that it was relying on in reaching its decision, appearing to weigh most heavily the postings and photographs on the Internet, as well as Vicki's demeanor. We cannot find that this decision was in error, especially since the trial court was in the position to observe Vicki throughout the trial and was able to observe the progress of the entire case throughout the lengthy litigation.

¶ 207    We find Vicki's argument that her behavior does not constitute depravity to be unpersuasive. Vicki points to the language in the Act that establishes presumptions in favor of depravity, arguing that her behavior falls quite short of the type of conduct that results in a presumption of depravity. We agree that Vicki's behavior is not on the same scale as murder or predatory criminal sexual assault, both of which result in a presumption of depravity. However, the commission of these types of crimes is not required in order for a person to be considered depraved. For instance, courts have found a person's use of drugs and alcohol to be sufficient for a finding of depravity. See *Baby Girl Casale*, 266 Ill. App. 3d at 663. As noted, " '[d]epravity may be shown by a series of acts or a course of conduct which indicates a deficiency in a moral sense and shows either an inability or an unwillingness to conform to accepted morality.' " *Baby Girl Casale*, 266 Ill. App. 3d at 663 (quoting *M.B.C.*, 125 Ill. App. 3d at 514). In the case at bar, the trial court found that Vicki's conduct rose to that level, and we do not find that decision to be against the manifest weight of the evidence. Accordingly, we affirm the trial court's finding of unfitness based on

depravity.

¶ 208     B. Lack of Interest, Concern, or Responsibility for the Child's Welfare

¶ 209     The trial court also found Vicki unfit based on section 1(D)(b) of the Act, which concerns "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2008). However, since we have found that the trial court's finding of unfitness based on depravity is not against the manifest weight of the evidence, we have no need to consider the alternate ground of unfitness.

¶ 210                              CONCLUSION

¶ 211     We find that the trial court's determination that Vicki was unfit is not against the manifest weight of the evidence and, accordingly, affirm the trial court's decision to terminate Vicki's parental rights.

¶ 212     Affirmed.