*In re* ADOPTION OF BABY GIRL CASALE, a Minor (John Doe *et al.*, Petitioners-Appellees, v. Hyman Kurnick, Respondent-Appellant).

First District (4th Division)   No. 1—92—0352

Opinion filed August 11, 1994.

Gene L. Armstrong and Derek G. Edens, both of Cichocki & Armstrong, Ltd., of Oak Park, for appellant.

Richard A. Lifshitz, Kathleen Hogan Morrison, and Carolyn E. Winter, all of Mandel, Lipton & Stevenson, Ltd., of Chicago, for appellees.

JUSTICE JOHNSON delivered the opinion of the court:

After a bench trial in the circuit court of Cook County, the parental rights of respondent, Hyman Kurnick (hereinafter Hyman), were terminated regarding his biological daughter, baby girl Casale (hereinafter referred to by the fictional name baby Caroline). The trial court thereafter entered a judgment order of adoption for baby Caroline in favor of petitioners, John and Jane Doe (hereinafter the Does).[1]

On appeal, Hyman contends (1) the trial court improperly

---

[1] We recognize that our decision in this case comes shortly after *In re Pe-*

determined that he was an unfit parent because he failed to maintain a reasonable degree of interest, concern, or responsibility with respect to baby Caroline's welfare; (2) the trial court improperly found him to be depraved; and (3) the cumulative effect of the arguments, actions, and conduct of the Does' counsel was so prejudicial as to deny him a fair trial.

We affirm.

The following facts are pertinent. In 1986, Christina Casale (hereinafter Chris), the biological mother of baby Caroline, commenced a relationship with Hyman which continued for several years. Throughout the majority of that period, Chris testified that Hyman drank or used drugs. When he drank, he would consume an entire fifth of rum, vodka or tequila during a four-hour period of time. He also used marijuana, cocaine, Valium and quaaludes. She stated that every time she saw him he would smoke about two "joints" and that he was "very messed up because of all the drinking."

In fact, his inebriation was often so extreme that he slurred his speech and vomited. Chris stated that Hyman would mix drugs and alcohol for the purpose of increasing his level of intoxication. According to Chris, Hyman not only used drugs but he also sold them. She testified that she observed him sell marijuana "at least 100 times" and cocaine "at least 50 times." After the first 2 or $2^1/_2$ years of their relationship, Hyman's drinking and drug habits remained unchanged. At this time, she saw him about five times a week and he consumed alcohol every day they were together.

In July 1989, Chris began living with Hyman and his habits remained the same. In October of that year, Chris discovered she was pregnant. She told Hyman about the pregnancy and he demanded that she have an abortion. Shortly thereafter, she experienced bleeding associated with the pregnancy and was examined by a doctor, who assured her the baby was fine. Hyman expressed his disappointment that she did not miscarry and again told her to have an abortion.

At the end of November 1989, because of their constant fights about the pregnancy, Chris left Hyman and moved in with her mother and stepfather. Suddenly, Hyman asked Chris to marry him, offered her an engagement ring, and asked her to move into the home he recently purchased in Morton Grove, Illinois. She attempted

_tition of Doe_ (1994), 159 Ill. 2d 347, decided by our supreme court. Although these two cases may appear similar in the first instance, they are, in fact, quite different. The dissimilarities between these cases render it unnecessary to substantively address the issues raised in _Doe_.

to discuss the baby with him, but he was only interested in renewing their relationship. In May 1990, Chris decided to give the baby up for adoption. She accordingly contacted the lawyer of a couple she knew wanted a baby and lied about the paternity of the child to protect her from Hyman.

Chris' friend, Laura Gaunt, testified that when Chris and Hyman first began dating she saw him drink at least "half of a fifth" bottle of rum or vodka about once a week. She indicated that he used drugs "from the time I met him until the last time I saw him." The drugs he used included marijuana, cocaine and various types of pills. She estimated that about one half of the times she saw him he snorted cocaine and almost every time she saw him he drank alcohol excessively.

Laura also observed Hyman sell marijuana at his apartment. She suspected that he sold cocaine from his apartment although she did not actually see any transactions take place. Each time she visited Hyman's apartment there was always marijuana present. On social occasions she estimated that he smoked three to four "joints." Laura was unable to note differences in Hyman's behavior when he was high as opposed to when he was sober because most of the time he was under the influence of "something."

Regarding Chris' pregnancy, Laura testified that Hyman wanted Chris to have an abortion. After Chris moved out of Hyman's apartment, Laura had several telephone conversations with Hyman, who only expressed his interest in getting back together with Chris. He was not concerned with the pregnancy.

In February 1991, Laura and Chris saw Hyman and his brother at a bar. Hyman proceeded to make a spectacle of himself emphatically declaring "Chris, I love you, I love you, but this is all your fault. I'm going to get the baby back." The bouncers at the bar were forced to intervene and separate Hyman from Chris and Laura.

After Hyman initiated proceedings to contest the adoption of baby Caroline, he called Laura and told her that he would consider stopping the petition if he met the adoptive parents and approved of the conditions they provided for the child. However, during the same conversation, he said he thought he could be a good father. A couple of days later, Hyman asked Laura if she thought Chris would be interested in baby Caroline if he got her back from the Does.

Baby Caroline was born on June 11, 1990, and three days later Chris executed a final and irrevocable consent to adoption, permanently agreeing to give up all custodial and parental rights to the child. The following day, the circuit court issued an interim order permitting baby Caroline to be released into the custody of the Does.

In June 1990, Hyman learned that Chris had given birth and had put the baby up for adoption. The next month, Hyman filed a petition to declare the paternity of baby Caroline. In April 1991, after a lengthy delay, the necessary blood test results were completed and Hyman was determined to be baby Caroline's biological father. On July 3, 1991, the Does filed an amended petition to adopt baby Caroline alleging numerous reasons regarding Hyman's parental unfitness.

Ultimately, the trial court declared Hyman unfit due to depravity and due to his failure to maintain a reasonable degree of interest, concern, or responsibility regarding baby Caroline's welfare. Accordingly, his parental rights were terminated and his consent to the adoption of baby Caroline was deemed unnecessary. On January 10, 1992, a judgment order of adoption was entered in favor of the Does. Hyman appeals.

Initially, Hyman asserts that the trial court improperly found that he failed to maintain a reasonable degree of interest, concern, or responsibility as to his baby Caroline's welfare.

Termination of the parental rights of biological parents requires the trial court to declare the parent unfit by clear and convincing evidence. (*In re J.R.Y.* (1987), 157 Ill. App. 3d 396, 403.) Unfitness is determined in accordance with section 1 of the Adoption Act (hereinafter the Act) (750 ILCS 50/1 (West 1992)). The Act provides in relevant part:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption, the grounds of such unfitness being any one or more of the following:
> ***
> (b) failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b).

Throughout Chris' pregnancy, Hyman refused to pay her medical bills. Although he did pay one bill in October 1989, he refused to pay any additional bills after Chris moved out of his apartment. In one instance, Chris sent him a bill from her doctor and Hyman told her it was too expensive and suggested that she find a cheaper health care facility such as Cook County Hospital.

On another occasion, Chris informed Hyman that she intended to keep the baby and raise it at the home of her mother and stepfather. Hyman responded that he was not going to be a "part-time father," suggesting that he would not support a child who did not live with him. When she suggested retaining a lawyer to address issues such as custody and child support, he said he did not want "any part of it." His only desire was to cohabit with Chris.

Hyman offers his purchase of a house for Chris as evidence of his interest in baby Caroline. He also maintains that his inquiries of Chris' mother and stepfather as to her physical well being establish concern for the child. These acts in themselves, however, do not demonstrate any concern for the baby, but, rather, an interest in rekindling his relationship with Chris.

The record evinces further attempts by Hyman to renew his relationship with Chris. He repeatedly called Chris at her mother's home, left letters on her car, followed her to her place of employment, and asked his friends to call her and attempt to convince her to reestablish her relationship with him. Hyman's behavior eventually became so intrusive that Chris filed for an order of protection against him, but never followed through with it because she "really got scared."

After the adoption, Hyman continued to disrupt Chris' life. He followed her to a softball game. He stood outside of her house yelling at her, accusing her of selling his baby. At no point during Hyman's contact with Chris, or his attempted contact with her, did he express any concern for baby Caroline's welfare.

■ In view of the aforementioned, it is apparent that Hyman's sole interest in baby Caroline was to use her as a tool to convince Chris to resume their relationship. The record is devoid of any demonstration of his genuine caring or concern for baby Caroline, but it is replete with instances of his disruption of Chris' life. The trial court found Hyman's statement to Chris—that he should not be expected to pay for a child who does not live with him—indicated that Hyman's sole purpose "wasn't love for the child[;] it was his drive to become accepted by Chris Casale."

"Trial court proceedings involving the unfitness of parents will not be reversed unless it is against the manifest weight of the evidence," and in view of the trial court's superior opportunity to view the parties and their testimony, its findings are given great deference. (*In re J.R.Y.* (1987), 157 Ill. App. 3d 396, 403.) We believe the trial court's finding of Hyman's parental unfitness, based on his failure to maintain a reasonable degree of care, concern, or responsibility for his child's welfare in accordance with section 1(D)(b) of the Act (750 ILCS 50/1(D)(b) (West 1992)), was not against the manifest weight of the evidence.

We again acknowledge our cognizance of *In re Petition of Doe* (1994), 159 Ill. 2d 347, which was recently decided by our supreme court. In *Doe*, the biological mother consented to the adoption of her son four days after his birth without informing the biological father of this decision. In fact, the mother told the father that the baby died and it was not until 57 days after the baby's birth that the father

learned the child was alive and was to be adopted. The father immediately contested the adoption of his son, but the trial court declared him unfit in accordance with section 1 of the Act. (750 ILCS 50/1 (West 1992).) The trial court accordingly found that his consent to the adoption was unnecessary under section 8 of the Act (750 ILCS 50/8 (West 1992)), as he failed to show sufficient interest in the child during the first 30 days of the child's life. The father appealed and this court affirmed the trial court's judgment. However, the supreme court later reversed the judgment of this court finding that the rights of the biological father were improperly terminated as he had, indeed, shown a reasonable degree of interest in the child as soon as he learned of the child's existence.

*Doe*, however, is factually distinguishable from the case we are called upon to decide here and does not alter our result. In this case, upon learning that Chris was pregnant, Hyman immediately demanded that she have an abortion. When Chris experienced bleeding associated with the pregnancy, Hyman was disappointed that she did not miscarry and again directed her to have an abortion. After she moved out of his apartment, he refused to pay her medical bills. The record clearly reflects that his eventual interest in baby Caroline was solely based upon his belief that the baby would be useful in his attempt to insert himself into Chris' life. The circumstances in this case are certainly vastly different from *Doe* and we, consequently, do not find it controlling.

Next, Hyman opines that the trial court erroneously found him unfit because he was depraved. We disagree.

The record evinces that Hyman drank a large amount of alcohol, smoked marijuana, snorted cocaine and took both Valium and quaaludes. Chris and her friend, Laura Gaunt, both testified that throughout their association with Hyman, he was almost always under the influence of either drugs, alcohol or both. His drinking was often so excessive that he would vomit and he sometimes took one or two Valium in addition to the alcohol because he could "get a good buzz from it."

Further, Hyman repeatedly followed Chris. He arranged to have his brother both watch her and follow her. He behaved hysterically in public, shouting accusations at her. After Hyman initiated proceedings to gain custody of baby Caroline, he told Chris' stepfather that Chris had better not testify against him in court and that "she would really regret it if he lost the case."

According to section 1(D)(i) of the Act (750 ILCS 50/1(D)(i) (West 1992)), the parental rights of a biological parent may be terminated if the parent is determined unfit due to depravity. Our supreme court

has defined depravity as " 'an inherent deficiency of moral sense and rectitude.' " (*In re Abdullah* (1981), 85 Ill. 2d 300, 305, quoting *Stalder v. Stone* (1952), 412 Ill. 488, 498.) "Depravity may be shown by a series of acts or a course of conduct which indicates a deficiency in a moral sense and shows either an inability or an unwillingness to conform to accepted morality." *In re M.B.C.* (1984), 125 Ill. App. 3d 512, 514.

■ In ruling on the issue of depravity, the trial court held that the testimony of credible witnesses concerning Hyman's use of drugs and alcohol demonstrated that his lifestyle "categorizes [him] as being depraved." We believe that Hyman's behavior was properly characterized as depraved and that the trial court's finding of unfitness based upon depravity was not erroneous and certainly not against the manifest weight of the evidence.

Section 8(a)(1) of the Act states:

> "(a) *** [C]onsents shall be required in all cases, unless the person whose consent would otherwise be required shall be found by the court, by clear and convincing evidence:
>
>> (1) to be an unfit person as defined in Section 1 of this Act[.]" (750 ILCS 50/8(a)(1) (West 1992).)

Therefore, as Hyman was properly found to be an unfit person in accordance with sections 1(D)(b) and 1(D)(i) of the Act, his consent to the Does' adoption of baby Caroline was unnecessary.

■ Finally, Hyman posits that the cumulative effect of the arguments, actions, and conduct of the Does' counsel so prejudiced him as to deny him a fair trial. "It is well established that the trial court, as a trier of fact, is presumed to have considered only admissible evidence in reaching its determination." (*People v. Cruz* (1991), 224 Ill. App. 3d 425, 426.) Consequently, we find any error concerning comments by the Does' counsel to be harmless.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HOFFMAN, P.J., and CAHILL, J., concur.