NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230638-U

NO. 4-23-0638

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 5, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* D.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Livingston County |
| Petitioner-Appellee, | ) | No. 21JA40 |
| v. | ) | |
| Jesse C., | ) | Honorable |
| Respondent-Appellant). | ) | Robert M. Travers, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE TURNER delivered the judgment of the court.
Justices Steigmann and Zenoff concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed the judgment of the trial court terminating
respondent's parental rights where the court's fitness findings were not against the
manifest weight of the evidence.

¶ 2     In October 2022, the State filed a motion to terminate the parental rights of
respondent, Jesse C., to his minor child, D.M. (born in 2016). The child's mother, Leah M., is
not a party to this appeal. However, we affirmed the termination of her parental rights in a
separate appeal. *In re D.M.*, 2023 IL App (4th) 230639-U. In June 2023, the trial court granted
the State's petition and terminated respondent's parental rights.

¶ 3     On appeal, respondent contends the trial court erred in finding the State proved he
was unfit by clear and convincing evidence. Specifically, respondent argues the court erred in
finding him depraved and finding he failed to show a reasonable degree of interest, concern, or
responsibility as to D.M.'s welfare. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5         On July 28, 2021, Lyndie Champion, a child protection specialist with the Illinois

Department of Children and Family Services (DCFS), went to a medical center in Pontiac,

Illinois, in response to a call that a sex offender, David, had access to D.M.  At that time, Leah

had a new baby, J.M., who was D.M.'s half-sibling.  Leah had been living with D.M. at David's

home, and David would not let DCFS employees inside.  Leah likened the home to a "hoarder's

situation," stating there was trash and food everywhere because David did not like to clean.

Because DCFS became involved, David did not want Leah at his home, and she had nowhere to

go and would be homeless.  Leah also reported, when D.M. went to a father figure's home, he

returned with bed bug bites on his legs and back.  Leah stated she did not know who D.M.'s

biological father was.  J.M. and D.M. were taken into protective custody.  In June 2022, Leah

surrendered her parental rights to J.M.

¶ 6         On July 29, 2021, the State filed a petition for adjudication of wardship, alleging

D.M. was neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court

Act) (705 ILCS 405/2-3(1)(b) (West 2020)), in that D.M.'s environment was injurious to his

welfare.  The State alleged Leah had mental health issues preventing her from properly

parenting, her housing lacked stability, and she allowed a subject with a history of sex offenses

unsupervised access to D.M.  The State further alleged D.M.'s living conditions were unsanitary,

with a likelihood of harm to his health, physical well-being, or welfare.  The petition stated

D.M.'s father was unknown.  The trial court subsequently placed temporary custody and

guardianship with DCFS.

¶ 7         In October 2021, respondent entered an appearance and, in December 2021, an

order for a judgment of paternity found he was D.M.'s biological father.  On January 4, 2022, the

trial court held a dispositional hearing. Respondent admitted D.M. was neglected under two counts of the petition for adjudication of wardship. The court ordered D.M. a ward of the court, with both guardianship and custody awarded to DCFS.

¶ 8        On October 26, 2022, the State filed a petition for termination of parental rights, alleging respondent was unfit (1) under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2022)) because he failed to maintain a reasonable degree of interest, concern, or responsibility for D.M.'s welfare, (2) under section 50/1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2022)) because he was depraved, and (3) under sections 1(D)(m)(i) and (ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i)-(ii) (West 2022)) for (a) failure to make reasonable efforts to correct the conditions that were the basis for the removal of D.M. during a nine-month period after the adjudication of neglect and (b) failure to make reasonable progress toward the return of D.M. to his care during a nine-month period after the adjudication of neglect. The State alleged a nine-month period of January 4, 2022, to October 4, 2022.

¶ 9        On May 19, 2023, the trial court held a hearing on the petition. Pepper Falatko, a foster care placement worker for DCFS, testified she had been D.M.'s caseworker since the case was opened. Falatko testified respondent had been incarcerated since 2019. Respondent was scheduled to complete his incarceration in 2026, and he had never met D.M. Respondent learned D.M. was his child in November 2021, when his fatherhood was formally adjudicated. DCFS recommended respondent have no contact with D.M. because such contact would involve D.M. visiting him in prison. Respondent completed a fatherhood class in prison, but the class did not satisfy DCFS requirements. Respondent had requested phone calls, video visits, and in-person visits with D.M., which were denied due to his incarceration. Respondent had no means to care for D.M. during his incarceration and had not requested contact information for D.M.'s foster

parents or asked if he could forward letters or gifts. Although respondent provided Falatko with the name of his mother, stating she could care for D.M., his mother was not considered a possible placement because of a previous DCFS case involving her. Respondent had no plans for the care of D.M. during his incarceration.

¶ 10　　　　The State presented a certified copy of respondent's criminal record showing he was convicted in DeWitt County on December 4, 2019, of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)), a Class X felony, which he committed on August 12, 2019. He was sentenced to eight years in prison. Respondent was also convicted in Bureau County in 2016 of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2014)), a Class 2 felony. Falatko was not aware of any actions respondent had taken to address his sex-offender status.

¶ 11　　　　Leah testified that she took D.M. to visit respondent within two weeks of his birth in 2016. She stated respondent asked her to arrange DNA testing, but she did not think he could be the father because he previously told her he could not conceive a child. Leah and D.M. lived with respondent's mother for about a year after D.M.'s birth. D.M. had not seen respondent's mother since.

¶ 12　　　　Respondent testified he asked Leah in 2016 if he was D.M.'s father and she repeatedly told him he was not. Respondent confirmed D.M. had not had contact with respondent's mother since D.M. was about one year old. However, when D.M. was with respondent's mother, she loved watching D.M. and caring for him. Respondent admitted he was incarcerated for aggravated criminal sexual abuse at the time D.M. was born. He disagreed with Leah's testimony that she brought D.M. to see him in prison.

¶ 13    Respondent testified he provided DCFS with the names of his mother and Marisol D., a woman whom he described as his best friend, who could take D.M. Respondent had lived with Marisol from 2018 to 2019. In August 2019, respondent was incarcerated for predatory criminal sexual assault of a child. His incarceration for that offense was scheduled to end on June 5, 2026. Respondent testified he had applied for a sex-offender treatment program and could be released earlier if accepted into the program. Meanwhile, he had completed multiple mental health classes and a fatherhood class.

¶ 14    Respondent testified he asked to communicate with D.M. multiple times and asked his attorney to arrange a call, but his requests were denied. He also said he requested the address of the foster parents. Respondent testified he wanted to send things to D.M., including letters and paintings, but he had no address to which he could send them. He testified he had no phone number for Falatko. He stated he had twice requested visitation with D.M., but both requests were denied. The State recalled Falatko in rebuttal, who testified respondent had been given a DCFS address to which he could send letters and cards for D.M. She also sent respondent a copy of her business card, and every service plan she sent to him listed her return address on the envelope.

¶ 15    The trial court found respondent was depraved. The court found respondent's testimony lacked credibility and he made no showing of rehabilitation. In particular, the court noted merely signing up for courses in prison did not establish respondent was rehabilitated. The court further found respondent failed to show a reasonable degree of interest, concern, or responsibility as to D.M.'s welfare. As a result, the court found him unfit based on those two counts. The court found the other counts were not proven by clear and convincing evidence.

¶ 16 On June 23, 2023, the trial court held the best interest portion of the hearing. Falatko submitted a report specially addressing the statutory factors applicable to the best interest determination and recommending termination of respondent's parental rights. Falatko testified D.M. was placed in foster care with J.M. and DCFS wanted to keep the children together. The best interest report showed D.M. had resided with his foster family for almost two years. He was bonded to his foster family and felt comfortable and safe there. The foster parents provided for D.M.'s medical, educational, and emotional needs. D.M. had stated he wanted to be adopted by his foster parents, who were willing to provide permanency for both D.M. and J.M.

¶ 17 The trial court found it was in the best interest of D.M. to terminate parental rights. Accordingly, the court entered an order terminating parental rights and changing the permanency goal to adoption.

¶ 18 This appeal followed.

¶ 19 II. ANALYSIS

¶ 20 On appeal, respondent argues the trial court erred in finding the State proved he was unfit by clear and convincing evidence. Specifically, respondent argues the court erred in finding him depraved and finding he failed to show a reasonable degree of interest, concern, or responsibility as to D.M.'s welfare.

¶ 21 We note this case has been designated as accelerated pursuant to Illinois Supreme Court Rule 311 (eff. July 1, 2018). Rule 311 states, in relevant part, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, petitioner's notice of appeal was filed on July 21, 2023. As a result, a disposition would otherwise be required by December 18, 2023. That filing deadline has passed. However, respondent requested, and was granted, separate

extensions of time to file a brief. Respondent's brief was filed on October 30, 2023. Due to technical issues, due dates for the State's brief and respondent's reply brief were extended, with the State filing its brief on November 22, 2023. Respondent filed a motion to strike the State's brief, resulting in another delay. The case was ultimately submitted on December 13, 2023, just five days before the otherwise required date for disposition. Given respondent's motions, we conclude good cause exists for issuing this decision after the 150-day deadline.

¶ 22　　　　Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2022)), the involuntary termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the State proves unfitness, it then must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the child. *In re D.T.*, 212 Ill. 2d 347, 363-66, 818 N.E.2d 1214, 1226-28 (2004).

¶ 23　　　　A determination of parental unfitness involves factual findings and credibility determinations the trial court is in the best position to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29, 115 N.E.3d 102. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *N.G.*, 2018 IL 121939, ¶ 29.

¶ 24　　　　The trial court first found respondent depraved. Section 1(D)(i) of the Adoption Act provides there is a rebuttable presumption a parent is depraved, and therefore unfit, if the parent has been convicted of predatory criminal sexual assault of a child in violation of sections

11-1.40 or 12-14.1 of the Criminal Code of 1961 or the Criminal Code of 2012 (Code). 750 ILCS 50/1(D)(i) (West 2022). Once a certified copy of a conviction for predatory sexual assault is entered into evidence, a finding of unfitness is justified unless the respondent overcomes the presumption of depravity by clear and convincing evidence. 750 ILCS 50/1(D)(i) (West 2022); see *Donald A.G.*, 221 Ill. 2d at 239, 252, 850 N.E.2d at 174, 182 (finding a certified copy of a conviction for predatory criminal sexual assault was enough to create a rebuttable presumption of depravity while citing the version of section 50/1(D)(i) in effect in 1998, which did not yet enumerate the offense of predatory criminal sexual assault).

¶ 25 The Adoption Act does not define depravity, but the Illinois Supreme Court has held depravity consists of "an inherent deficiency of moral sense and rectitude." (Internal quotation marks omitted.) *Donald A.G.*, 221 Ill. 2d at 240-41, 850 N.E.2d at 175. " 'Depravity may be shown by a series of acts or a course of conduct which indicates a deficiency in a moral sense and shows either an inability or an unwillingness to conform to accepted morality.' " *In re Adoption of Baby Girl Casale*, 266 Ill. App. 3d 656, 663, 639 N.E.2d 174, 178-79 (1994) (quoting *In re M.B.C.*, 125 Ill. App. 3d 512, 514, 466 N.E.2d 273, 275 (1984)).

¶ 26 Here, the State showed respondent was previously convicted of predatory criminal sexual assault of a child under section 11-1.40 of the Code. Thus, respondent was presumed depraved, and a finding of unfitness was justified unless he overcame the presumption by clear and convincing evidence. The trial court reasonably found he did not do so. While respondent took a fatherhood class, it was not approved by DCFS. Respondent had applied for sex-offender treatment, but nothing showed he was likely to be admitted, and he otherwise did not show he had addressed his sex-offender status. He stated he took mental health courses but provided no details about them. Respondent also had another previous conviction of a sex

- 8 -

offense that he did not sufficiently address, showing a course of conduct which indicates a deficiency of moral sense and either an inability or an unwillingness to conform to accepted morality. The court further found respondent's testimony lacked credibility. Thus, we find the court's determination respondent was depraved was not against the manifest weight of the evidence.

¶ 27     "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349, 830 N.E.2d 508, 514 (2005). Accordingly, we need not, and do not, discuss the trial court's alternate finding respondent failed to show a reasonable degree of interest, concern, or responsibility as to D.M.'s welfare.

¶ 28     Respondent also does not argue the trial court erred in its ultimate determination that it was in the best interest of D.M. to terminate his parental rights. Thus, we also need not address that matter. However, we nevertheless note the facts do not demonstrate the court should have reached the opposite result in its findings. Accordingly, the court's determination was not against the manifest weight of the evidence.

¶ 29                              III. CONCLUSION

¶ 30     For the reasons stated, we affirm the trial court's judgment.

¶ 31     Affirmed.